**Diane EAGLEBURGER, et al., Respondents,**

v.

**EMERSON ELECTRIC CO., Appellant.**

**No. 16042.**

Missouri Court of Appeals, Southern District, En Banc.

June 29, 1990.

Motion for Rehearing and Transfer to Supreme Court Denied Aug. 6, 1990.

Application to Transfer Denied Sept. 11, 1990.

Raymond E. Whiteaker, Brad J. Fisher, Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for appellant.

Thomas Strong, Jeffrey W. Bates, Strong & Associates, P.C., and John Wooddell, Bruer & Wooddell, P.C., Springfield, for respondents.

CROW, Judge.

Defendant Emerson Electric Co. ("Emerson") appeals from a $1,060,650 judgment against it in an action for the alleged wrongful death of Gene Eagleburger.[1]

---

**1.** Reimann & Georger, Inc. was also a defendant in the action until it settled with plaintiffs for

$64,350 shortly before trial and was discharged. The jury returned a verdict for plaintiffs against

Plaintiffs are: Diane Eagleburger (Gene's widow); John Henry Eagleburger, Tracy Diane Eagleburger and Gene Henry Eagleburger, Jr. (Gene's children); and Evelyn Eagleburger (Gene's mother).

Gene, a roofer by trade, was electrocuted August 16, 1985, while replacing the roof on a church in Springfield. Plaintiffs based their claim against Emerson on the theory that Gene's death was caused by a defective product sold by Emerson. Emerson refers to the product as a "track platform hoist"; plaintiffs call it a "ladder." It was manufactured by Louisville Ladder Company ("Louisville"), a division of Emerson.

The product, assigned "code number" LH444 by Louisville, consists of three components: an aluminum track, a platform-and-pulley assembly, and a gasoline-operated "power unit."

The track comes in four sections: a 16–foot base section, a second 16–foot section that can be bolted to the base section, an 8–foot section that can be bolted to either of the other two sections, and a 4–foot section that can be bolted to either of the other three sections. A customer may purchase any or all of the track sections. Bolting all four together produces a 44–foot track.

The platform rolls up and down the track, and is designed to carry a maximum load of 400 pounds. The platform is raised by a cable through the pulley at the top of the track. Power is supplied by the power unit.

At the time of Gene's death the track was assembled in a 40–foot length (the two 16–foot sections and the 8–foot section). Those three sections, disassembled, are shown in the photograph at the end of this opinion.

The events that culminated in Gene's death began in May, 1985, when Gene Brown, a roofing contractor, was awarded a contract to replace the roof on the church. A month later Brown bought the track platform hoist described above.

Gene and his younger brother, Danny Eldon Eagleburger, were partners in their own roofing business. Brown subcontracted the church job to them. Because of the height of the roof, the Eagleburgers borrowed the track platform hoist from Brown. They commenced work around August 1, 1985. The crew consisted of Gene, Danny, their brother Jack, and Gene's son John.

They started on the south side of the church where the roof was 31 feet above the ground. They assembled the track in a 36–foot length and used the hoist to lift the new shingles from the ground to the roof and to lower the old shingles from the roof to the ground. According to Danny they raised the track by having one man hold the base while two others lifted the far end and "walked it up." Danny recounted that in addition to using the device as a hoist they climbed the track "just like a ladder."

By August 16, 1985, they had completed everything except the west side where the roof was 35 to 36 feet above the ground. Gene Brown, who visited the site between 8:30 and 9:00 that morning, observed "some electric wires that looked like naked wires" above the curb some 15 feet from the church. He estimated the wires were 25 feet off the ground.

Brown testified he pointed out the wires to Gene. According to Brown, Gene "said not to worry, he wouldn't be no where near those wires."

To enable the track to reach the roof the crew removed the 4–foot section and added the 8–foot section, making the track 40 feet long. Gene walked along the curb looking up at the wires and a nearby tree. John Eagleburger recalled Gene saying there was a "V-shape" in the tree and "the ladder would go up through that."

A priest at the church told Gene the priest could shut off the electricity. Danny overheard the remark and announced this would do no good because the wires were "still going to be hot running into the church."

Emerson, the only remaining defendant, for $1,125,000. The trial court deducted the $64,-

350 settlement and entered judgment in favor of plaintiffs and against Emerson for $1,060,650.

Jack positioned himself at the base of the track to hold it. Gene and John went to the far end and began walking the track up. John testified he never felt "any kind of a wobble, or a shakiness" as if the track was getting off balance.

When John and Gene were some 14 feet from the base of the track John felt electricity "like it was turning my body inside out." Danny, who was on the roof, heard some "loud pops" and saw a "flash of light." Danny could not see the top of the track but he did see the flash going from the wire "into the top of the tree."

Gene and Jack were both killed.

A captain of the Springfield Fire Department who investigated the incident testified that when he arrived "there was a ladder that was up in a tree," the top of the "ladder" being situated "just below the wires." The other end was on the ground.

Danny Eagleburger confirmed at trial that after the electrocution the top of the track was "stuck up in the tree."

An engineer for the electric utility testified that the "voltage potential" of the line by the church is 7,620 volts.

Plaintiffs commenced this action March 14, 1986, by suing the City of Springfield (owner and operator of the electric utility). On May 27, 1987, plaintiffs filed an amended petition adding Emerson and Reimann & Georger, Inc.[2] ("R & G") as defendants.

As to Emerson, plaintiffs alleged the track platform hoist was defective and dangerous when put to a use reasonably anticipated in that (a) the track was designed and manufactured to be raised to heights up to 44 feet as one single unit, making the track heavy and unwieldy, (b) the device was designed and manufactured to be used in lengths greater than the National Electric Safety Code standard heights for uninsulated, high voltage electrical conductors, (c) the track was designed and manufactured out of highly conductive aluminum, (d) the track was designed and manufactured without insulating materials or links to protect against foreseeable conduction of electric currents, and (e) the device

failed to adequately warn users of the risk involved when it was used in proximity to electrical power lines.

John M. Monohan, III, Louisville's vice president for administration and engineering, testified that around 1959 or 1960, R & G conceived the idea of making a loader to fit a standard Louisville ladder and using a motor to raise the loader up the ladder. At first, R & G purchased Louisville ladders from dealers or distributors, added the hoist assembly and power unit, and marketed the finished product. The initial load capacity was 200 pounds.

Louisville began supplying ladders directly to R & G in the lengths the latter specified. R & G eventually developed a loader with a 400 pound capacity that required a stronger ladder with a deeper rail and offset rungs. Louisville developed a ladder with those characteristics.

In 1965 Louisville began marketing its own ladder-and-loader units. At that time the ladder did not exceed 28 feet in length. In 1969 Louisville began making a "forty-four foot unit."

In March, 1979, according to Monohan, R & G and Louisville made a "joint decision" to call the ladder a "track." Up until then it had been called a ladder.

Two years earlier a "task force" had been created in the ladder industry to write "design standards" for the American National Standards Institute, Inc. ("ANSI"). Louisville's former president and one of its engineers were on the drafting committee. The standards, published in 1980, contained a section limiting the length of ladders.

George Greene, Jr., a consulting engineer who testified for plaintiffs, explained that the ANSI standards defined a sectional ladder as "a non self-supporting portable ladder, non adjustable in length, consisting of two or more sections, and so constructed that the sections may be combined to function as a single ladder." The ANSI standards, said Greene, limited the length of a single heavy duty or extra heavy duty ladder to 30 feet.

2. Footnote 1, *supra.*

Louisville's Monohan conceded that in December, 1979, some eight or nine months after the decision to change the name "ladder" to "track," Louisville's engineering staff, in a written study of the product, referred to it as a "ladder." In October, 1983, a design drawing of the 400-pound capacity model prepared by Louisville's engineers referred to it as a "ladder." Until March, 1984, a label attached to the track near the "safety shoe" called the track a "ladder" and referred to people climbing it. Until July, 1987, every track produced by Louisville bore another label that called the track a "ladder." Louisville's "price sheets" for 1974, 1978, 1983 and 1985 called the track a "ladder." A "bill of materials" produced by Louisville's computer in January, 1988, referred to the device as a "hoist ladder."

Monohan admitted that a user may think of the track as a ladder, that it looks like a ladder, that it can be handled and maneuvered like a ladder, and that it is built on Louisville's aluminum ladder assembly line. Monohan agreed it is reasonably foreseeable to Louisville that the track will be used like a ladder, and that nothing on the track warns a user not to climb it. Monohan acknowledged that but for the fact that the track "wasn't supposed to be climbed," it fits the ANSI definition of a sectional ladder.

The first of Emerson's nine points relied on has three components. Component "A" avers the trial court erred in receiving in evidence Plaintiffs' Exhibits 54 and 54-A.

Emerson misstates the record insofar as Exhibit 54 is concerned.

Exhibit 54 was identified by plaintiffs' expert Greene (mentioned earlier) as a "computer printout sheet furnished by the Consumer Products Safety Commission relating to injuries where ladders were involved" during a 10-year period from "some time in '77 through some time in '87." Greene explained that the Commission is a federal agency whose goal is "to develop statistics for injury causation and try to offer suggestions and even mandate design changes in products to make them safer."

Greene testified he had reviewed Exhibit 54 and had "pulled out" cases "where there was an inadvertent contact between an aluminum ladder and a power line." He identified Exhibit 54-A as a "summary" of those cases. Plaintiffs offered Exhibit 54-A—but *not* Exhibit 54—in evidence.

Emerson objected that the exhibit listed inadvertent contact between aluminum ladders and a power line without listing any of the circumstances. Emerson argued that some of the incidents could involve a short stepladder.

Plaintiffs replied that the purpose was not to show the similarity of a product, but to show "the danger of mixing aluminum and electricity, and this goes to the reasonableness of . . . the danger of an aluminum ladder and electricity." Plaintiffs stated that was the "sole purpose of the offer."

The trial court overruled the objection and received Exhibit 54-A (alone) in evidence.

Greene then testified that during the period covered by the printout there were reports of 426 people being injured or killed through inadvertent contact between an aluminum ladder and a power line. On cross-examination Greene admitted he was unable to determine what size ladder those 426 people were using or what work they were doing. All he knew was that all of them were outdoors.

Emerson asserts that evidence of prior accidents is admissible only if the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those in issue. Emerson cites five cases in support of its contention that Exhibit 54-A should have been rejected.

The earliest of the five is *Taylor v. Kansas City*, 342 Mo. 109, 112 S.W.2d 562 (1937). There the plaintiff claimed she was hurt when she fell because of a defect in a sidewalk. Over objection she presented evidence that eight days before she fell another individual had fallen at the same place, and two weeks before that incident another individual had fallen at the same place. The Supreme Court of Missouri,

noting that the plaintiff contended she had fallen because of a slope in the sidewalk on the east side of a manhole cover, and further noting that the evidence of the two earlier falls did not indicate that either had been caused by that particular condition, held that the evidence of the two earlier falls was of no probative value. 112 S.W.2d at 566–67.

Another case cited by Emerson is *Nothaus v. City of Salem,* 585 S.W.2d 244 (Mo.App.1979). There the plaintiffs sought to enjoin the construction and operation of a sanitary landfill in Dent County. They offered evidence about the condition of a landfill in Phelps County, arguing it would show that the proposed landfill would be a nuisance. Upholding the trial court's rejection of the evidence, this Court held that improper operation of the Phelps County landfill could not be proof that the landfill in Dent County would be improperly operated after its construction. *Id.* at 246–47[4].

The third case cited by Emerson is *Schultz v. Webster Groves Presbyterian Church,* 726 S.W.2d 491 (Mo.App.1987). There the plaintiff fell after entering a church. Her evidence showed that the floor was wet from snow tracked in from outside. She offered testimony from a person who had entered the church through a different entrance 45 minutes earlier. That person would have testified that the floor at the entrance she used was also saturated. The trial court rejected the evidence. On appeal by the plaintiff from a judgment in favor of the church, the ruling was affirmed on the ground that it is not permissible, for the purpose of establishing whether a condition at one place is dangerous, to show conditions at places other than the one in question. *Id.* at 495[6].

The fourth case cited by Emerson—*Poston v. Clarkson Construction Co.,* 401 S.W.2d 522 (Mo.App.1966)—was an action by homeowners for damage to their house allegedly caused by a blasting operation conducted by a highway contractor. The plaintiffs offered testimony by other residents in the neighborhood that their houses had been damaged by the same blasting.

The trial court rejected the evidence and the jury returned a verdict for the contractor. The appellate court held that evidence of other instances of similar result from a common cause is logically relevant only when the essential circumstances are sufficiently similar to exclude a reasonable likelihood of the same result being produced by a different cause in the two instances. *Id.* at 526[2]. That is, when a thing's capacity or tendency to produce an effect of a given sort is to be evidenced by instances of the same effect found attending the same thing elsewhere, these other instances have probative value to show such a tendency or capacity only if the conditions or circumstances in the other instances are similar to those in the case in hand. *Id.* at 526. As the other houses "pretty well surrounded" the plaintiffs' house in *Poston,* the appellate court held that evidence that the blasting in question damaged those other houses was logically relevant to the sole issue of whether the blasting was of sufficient force to cause the damage to the plaintiffs' house. *Id.* at 527–28.

The final case cited by Emerson in support of component "A" of its first point is *Hale v. Firestone Tire & Rubber Co.,* 820 F.2d 928 (8th Cir.1987). We have studied that case and find nothing pertinent to component "A." The case Emerson may have intended to cite is *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322 (8th Cir.1985). There the plaintiff was injured when part of the assembly of a truck wheel rim separated under pressure and struck him. The trial court, over objection, received evidence of 210 other accidents involving explosive separation of similar rims with no restriction as to the circumstances or the dates of the accidents. The appellate court held that evidence of prior accidents is admissible only if the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar. *Id.* at 1332[16]. As there was an insufficient showing of similarity, the evidence of the 210 other accidents was inadmissible.

■ In response to component "A" of Emerson's first point, plaintiffs cite *Pierce*

*v. Platte–Clay Electric Cooperative, Inc.,* 769 S.W.2d 769 (Mo. banc 1989), a case analyzed in McCarter and Corrigan, *Evidence of Similar Occurrences and Non–Occurrences,* 46 Jour. of The Missouri Bar 126 (Mar.1990). In *Pierce* a farmer, while driving a tractor pulling a spreader in a field, snagged a guy wire supporting a "stub pole," which in turn secured a cable supporting a utility pole. The stub pole broke, allowing the cable to drop to the surface of a highway. The farmer, observing an automobile approaching on the highway, ran to warn the motorist about the cable. The motorist did not see the farmer. The automobile hit the cable, which became taut and caught one of the farmer's legs. The cooperative had placed the stub pole in the midst of some trees with the guy wire extending into brush at the edge of the field. The farmer sued the cooperative, alleging it knew or should have known that persons operating farm machinery faced an unreasonable risk of injury and that the cooperative was negligent in failing to place a colored marker on the guy wire to warn of its presence. In the four years prior to the accident there had been nine reports to the cooperative concerning contact between farm machinery and guy wires. The trial court allowed the farmer to present evidence of two such reports to demonstrate the cooperative's notice that farm machinery had struck unmarked guy wires. On appeal the cooperative argued the incidents were not substantially similar and therefore irrelevant. Affirming a judgment for the farmer, the Supreme Court of Missouri held that when evidence of other accidents is introduced to show notice of danger, the similarity in the circumstances of the accidents need not be completely symmetrical. *Id.* at 774[5]. The opinion explained that the reports of the two earlier incidents were relevant to show that the cooperative was aware of the risk of farm machinery contacting unmarked guy wires and that such an event could foreseeably result in an unreasonable risk of injury. *Id.* at 774. Trial courts have wide discretion on issues of admission of evidence of similar occurrences. *Id.* at 774[6]. Appellate review is limited to a finding that the trial court first satisfied itself that the evidence was relevant to an issue of the case and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice or confusion of issues. *Id.*

Plaintiffs point out that their expert Greene testified that lines carrying 7,000 or more volts of electricity are generally uninsulated, there being no way to effectively insulate a line carrying that amount of voltage. For that reason, said Greene, the 1984 edition of the National Electric Safety Code requires that any lines carrying that amount of voltage be suspended at least 15 feet above the ground. Greene added that a "service drop" (a line carrying electricity from a pole to a building) is always insulated, as insulation is effective "up to about 600 volts."

Plaintiffs maintain that by reason of the above evidence, the accidents listed in Exhibit 54–A must have involved ladders long enough to get into power lines 15 feet or more above the ground. Greene based his testimony on that premise.

Plaintiffs also direct our attention to the following excerpt from the testimony of Louisville's executive Monohan:

"Q And I think you told me that you would consider those accidents statistics gathered by the consumer products safety commission to be relevant in studying your industrial products.

A Insofar as electrocution of aluminum ladder and power lines, yes."

Plaintiffs assert that Exhibit 54–A was admissible inasmuch as the accidents summarized therein were sufficiently similar to Gene's electrocution to show the foreseeable use of the product involved here and the magnitude of the danger posed by its foreseeable use.

It appears to us that the four Missouri cases relied on by Emerson (*Taylor, Nothaus, Schultz* and *Poston*) do not involve the issue presented by Exhibit 54–A. In *Taylor* the plaintiff used evidence of falls by two other persons as proof that her fall was caused by the slope in the sidewalk.

In *Poston* the plaintiffs attempted to use evidence that other homes were damaged by blasting as proof that their house was damaged by the same blasting. In *Nothaus* the plaintiffs sought to use evidence about the condition of an existing landfill as proof that the landfill to which they objected would be a nuisance. In *Schultz* the plaintiff attempted to use evidence of the condition of the floor in one part of the church as evidence that the floor in the area of the church where she fell was slick.

■ In the instant case plaintiffs did not use Exhibit 54–A for the purpose of convincing the jury that inasmuch as 426 other people had been injured or killed when aluminum ladders they were using contacted electric lines, the jury should find that electricity was the agency that killed Gene and that the electricity was transmitted from the power line to him by the aluminum track. Had plaintiffs used Exhibit 54–A for that purpose its admissibility would have been governed by the four Missouri cases relied on by Emerson. Here, however, it was undisputed that Gene was electrocuted, that the source of the electricity was the power line near the tree, and that the electricity was conducted by the track.

There was a question as to whether the track touched the line or whether the track touched a tree limb, which in turn touched the line and conducted electricity from the line to the track. Plaintiffs' expert Greene expressed the opinion that there was no contact between the track and the line. Danny Eagleburger testified he never saw the track touch the line and John Eagleburger testified the track did not touch the line. A line foreman for the electric utility removed the line some five months after Gene's death; the foreman observed the line had three "holes" with "aluminum flakes metal melted into the holes." The foreman testified it appeared that the line had been in contact with something made of aluminum.

Be that as it may, all parties agreed that Gene was killed when electricity from the power line traveled down the track and into his body.

We have scrutinized those places in the record cited by Emerson where plaintiffs made use of the statistics in Exhibit 54–A, and it is clear that plaintiffs did not employ the data for the purpose of establishing that Gene met his death by electrocution, but instead to demonstrate that Emerson should have realized the danger inherent in using aluminum ladders near electric power lines. Indeed, Louisville's Monohan acknowledged awareness of the possible peril:

"[Q]: Would it surprise you to know that in the last ten years there have been some 450 serious injuries or deaths occurring by aluminum ladder or track assemblies—[A]:—No, that wouldn't surprise me. [Q]:—becoming energized. [A]: That would not surprise me.

[Q]: As your answer alluded to a moment ago, the Consumer Product Safety Commission reports data basically on consumer products as opposed to industrial products, true. [A]: That's correct.

[Q]: And Louisville Ladder's line, at least in the large majority, is industrial as opposed to consumer. [A]: That's correct. [Q]: An industrial aluminum ladder is just as conductive as a consumer one. [A]: Absolutely.

[Q]: And presents the same risk of electrical injury that the consumer ladder does. [A]: Yes. [Q]: Would you agree then, that the data collected on consumer quality and size aluminum ladders would have significance to the manufacturer of industrial quality aluminum ladders. [A]: So far as electrocution cases are concerned, certainly."

Plaintiffs' theory of liability against Emerson, as expressed by their expert Greene, was that the track Gene was using when he was electrocuted was defective and unreasonably dangerous as designed. Greene emphasized that the track is "highly conductive" of electricity, it is used around power lines, and by reason of its length it is unwieldy. In arriving at his opinion Greene considered the magnitude of the danger encountered by the user and the frequency with which death or injury occurs. The statistics in Exhibit 54–A were utilized by Greene in that analysis. He

recounted that one purpose of the ANSI limit of 30 feet on a single ladder is that when a ladder gets beyond that length "it's just too dangerous to try to erect them." According to Greene, "They're too unwieldy to handle."

Greene testified that the risks endemic in the track could be significantly minimized by limiting it to 30 feet, or by changing it to an extension track where the top section is telescoped up from the base section, or by making the track of fiberglass, or by retaining aluminum construction but putting "insulated links" in the track to prevent electricity from coming down the track if it touches a power line.

In *Siebern v. Missouri–Illinois Tractor & Equipment Co.*, 711 S.W.2d 935 (Mo. App.1986), the operator of a "coal loader" was killed when he backed it off a ledge and it landed upside down, crushing him. His survivors sued, claiming the loader had been defectively designed in that it lacked a "rollover protective structure" and seat belts. On appeal by the survivors from an adverse judgment the Eastern District of this Court reversed for failure of the trial court to allow certain expert testimony tendered by the survivors. The Eastern District did, however, approve the trial court's ruling allowing the defendants' experts to testify regarding independent studies conducted under the authority of the U.S. Bureau of Mines involving rollover tests of heavy equipment of different sizes and weights. The opinion stated that the studies were properly admitted as a basis for expert opinion. *Id.* at 940[6].

In the instant case the admissibility of Exhibit 54–A was debated at a pretrial conference and carefully considered by the trial judge. Essentially the same arguments were presented there as have been presented here. The trial judge ruled against Emerson at the pretrial conference and, as we have seen, repeated the ruling when the exhibit was offered at trial.

Given the purpose for which plaintiffs offered Exhibit 54–A and the uses they made of it after it was received, i.e., as evidence that Emerson should have realized the magnitude of the danger inherent in using aluminum ladders near electric power lines, and as statistical information upon which Greene relied in determining that the track was defective and unreasonably dangerous as designed, we have determined the admissibility of Exhibit 54–A is governed by *Pierce*, 769 S.W.2d 769, and *Siebern*, 711 S.W.2d 935, not by the Missouri cases cited by Emerson. Applying *Pierce* and *Siebern* we hold that the trial court did not abuse its discretion in receiving Exhibit 54–A in evidence. Component "A" of Emerson's first point is denied.

Component "B" of Emerson's first point avers the trial court erred in receiving in evidence Plaintiffs' Exhibits 55 and 55–A concerning 13 accidents involving Louisville's model LH444 platform hoist in that plaintiffs made no showing that the circumstances surrounding any of those accidents had any similarity to the accident in which Gene was killed.

Emerson misstates the record in averring that the exhibits concerned 13 accidents. Exhibit 55 is a stack of documents some two inches thick. The documents were evidently obtained by plaintiffs from Emerson and R & G during discovery. Exhibit 55–A is a transparency identified by plaintiffs' expert Greene as a summary of six "accidents" documented in Exhibit 55 involving the same model track used by Gene. The dates of the six accidents shown on Exhibit 55–A are: May 19, 1975, December 9, 1976, April 17, 1978, September 29, 1982, August 16, 1985 (the incident out of which the instant case arose), and March 10, 1986. The exhibit listed 14 "victims," in the aggregate, in the six accidents.[3]

In a hearing outside the presence of the jury regarding the admissibility of Exhibits 55 and 55–A, Emerson conceded it made the "ladder" involved in the 1976 and 1982 occurrences, as well as the track in the instant case. Emerson did, however, object to any reference to the 1975, 1978 and 1986 occurrences on the ground that there was no showing Emerson had made the tracks involved in those occurrences. The trial

---

**3.** Two of the fatalities and one of the injuries were attributed to the instant accident.

court received Exhibits 55 and 55–A in evidence.

In paragraph 1 of Emerson's motion for new trial Emerson averred the trial court erred in allowing plaintiffs to delve into "14 deaths or injuries and 7 other lawsuits variously associated with the use of [Emerson's] product." The motion for new trial alleged such evidence was permitted "despite absolutely no linking testimony or evidence or foundation that these other alleged accidents were in any way substantially similar to the facts or instrumentalities involved in the case before this Court."

While the allegations in the motion for new trial do not identify Exhibits 55 or 55–A, we shall assume, without deciding, that the allegations were sufficient to inform the trial court that Emerson was complaining about those exhibits. We find nothing else in the motion for new trial arguably referring to Exhibits 55 and 55–A.

The scope of the motion for new trial exceeds the scope of the objection at trial. The trial objection, as we read the transcript, was limited to the occurrences in 1975, 1978 and 1986, and was on the ground that there was no showing that Emerson had made the tracks involved in those three occurrences. The motion for new trial, however, endeavored to complain about all six occurrences listed in Exhibit 55–A.

The only objections to evidence that can be considered on appeal are those that are made in the trial court. *State ex rel. State Highway Commission v. Northeast Building Co.*, 421 S.W.2d 297, 301[4] (Mo.1967). Consequently, the only complaint about Exhibits 55 and 55–A that Emerson preserved at trial was that there was no showing it had made the tracks involved in the 1975, 1978 and 1986 occurrences.

■ Even that, however, has not been preserved for appellate review. We espy nothing in Emerson's motion for new trial assigning error in the admission of Exhibits 55 and 55–A on the ground that Emerson was not shown to be the manufacturer of the tracks involved in the 1975, 1978 and 1986 occurrences. A claim of error on appeal is limited to that advanced in the motion for new trial and we do not consider a different ground of objection. *Lott v. Kjar*, 378 S.W.2d 480, 485[4] (Mo.1964). Inasmuch as Emerson's trial objection that it was not shown to be the manufacturer of the tracks involved in the 1975, 1978 and 1986 occurrences was not carried forward in the motion for new trial, it has not been preserved for appellate review. That being so, component "B" of Emerson's first point presents nothing for our consideration.

Component "C" of Emerson's first point reads:

"The court erroneously admitted testimony regarding the Pitman Hotstik, an aerial bucket lift manufactured by the A.B. Chance Company, formerly a subsidiary of Emerson, and regarding alterations made in the design of that product, although the only similarity between the Hotstik and the platform hoist was that each was manufactured by an entity that was once a subsidiary of Emerson, and plaintiffs made no showing of any other similarity."

Rule 84.04(d), Missouri Rules of Civil Procedure (20th ed. 1989) provides:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

The first requirement of the above rule is that a point relied on identify the ruling of the trial court on which review is sought. *Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978).

■ Component "C," quoted above, identifies no ruling and supplies no clue as to the particular testimony about which Emerson complains. A bare allegation that the trial court erred in permitting certain testimony is inadequate, not only because it fails to identify the offending ruling but also because it fails to indicate that the complaining party timely and adequately opposed the ruling at trial. *Thummel*, 570 S.W.2d at 685; *Albers v. Hemphill Contracting Co., Inc.*, 740 S.W.2d 660, 662[1] (Mo.App.1987).

We have nonetheless resorted to the argument portion of Emerson's brief in an effort to discover the rulings Emerson seeks to attack, a task we are not obliged to undertake. *Draper v. Aronowitz,* 695 S.W.2d 923, 924[3] (Mo.App.1985); *Tripp v. Harryman,* 613 S.W.2d 943, 950[11] (Mo. App.1981).

■ The first instance mentioned by Emerson is testimony by plaintiffs' witness Greene that he had worked on eight or nine cases involving people who were seriously injured in the Hotstik. Emerson registered no objection to that answer. Only when Greene mentioned that the manufacturer of the Hotstik was a division of Emerson did Emerson object. The objection was: "We seem to be getting off into other products again, this is irrelevant and immaterial." That is not the ground advanced on appeal in component "C."

We have considered the other instances complained of by Emerson and have determined that they do not warrant relief as plain error, Rule 84.13(c), as no manifest injustice or miscarriage of justice resulted therefrom. Component "C" of Emerson's first point is denied.

■ Emerson's second point has two components, the first of which is designated "A." It assigns error in the giving of instruction 5, which read:

"The term 'the product' as used in these instructions means the ladder-type track sold to Brown ... and used at the ... Church job."

Emerson maintains instruction 5 was erroneous in defining the platform hoist as a "ladder-type track," in that the instruction directed the jury to find that the hoist was a ladder when the nature of the product was a material factual issue. Emerson complains that throughout the trial plaintiffs' lawyers repeatedly characterized the product as a ladder in order to make it amenable to various safety standards applicable to ladders. Emerson reminds us it is reversible error for a jury instruction to assume a fact issue controverted throughout the trial. *Charles F. Curry and Co. v. Hedrick,* 378 S.W.2d 522, 532[7] (Mo.1964).

Plaintiffs respond that inasmuch as the track platform hoist consisted of three constituent parts (the track, the platform-and-pulley assembly, and the power unit) and plaintiffs made no claim that anything other than the track was defective, it was within the trial court's discretion to identify for the jury the part that was in issue.

During trial the track was referred to as a "ladder" by a maintenance man employed by the church, by the fire department captain who investigated the occurrence, by a police corporal who investigated the occurrence, by Gene Brown who purchased the device, by Danny Eagleburger, by the priest who volunteered to shut off the electricity, by John Eagleburger, and by a commercial roofer presented as a witness by Emerson. Additionally, as we have seen, the track was called a ladder—nothing else—by Louisville until 1979, and even after that it was referred to as a ladder in Louisville's documents from time to time. The jury was consequently aware that a number of individuals, and indeed some of Louisville's staff, had referred to the track as a ladder.

Furthermore, instruction 5 did not define the term "the product" as a "ladder." Instruction 5 defined the term "the product" as the "ladder-type track" sold to Brown and used at the church. The compound word "ladder-type" is nothing more than an adjective describing the noun "track." The accuracy of the description can scarcely be challenged.

The track was shown in numerous photographs received in evidence, including the one appended to this opinion. The jury thus had ample opportunity to become familiar with its appearance and observe its characteristics.

In considering the language of any instruction we should be concerned primarily with its meaning to a jury of ordinarily intelligent laymen, crediting them with common sense and average understanding of the English language. *Samuels v. Klimowicz,* 380 S.W.2d 418, 421[3] (Mo.1964). It insults the intelligence of the jurors here to say they may have understood instruction 5 as a command to find that the track

is a ladder. Component "A" of Emerson's second point is denied.

■ Component "B" of Emerson's second point attacks instruction 7, which read:

"Your verdict must be for plaintiffs against defendant Emerson ... if you believe:

First, plaintiff Diane Eagleburger was the wife, John, Tracy and Gene Eagleburger, Jr., were the children, and Evelyn Eagleburger was the mother of Gene Eagleburger, and

Second, defendant Emerson ... sold the product in the course of said defendant's business, and

Third, the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Fourth, the product was used in a manner reasonably anticipated, and

Fifth, such defective condition as existed when the product was sold by said defendant directly caused or directly contributed to cause the death of Gene Eagleburger,

unless you believe plaintiffs are not entitled to recover by reason of Instruction No. 8."

Paragraph "First" of instruction 7 is based on paragraph "First" of MAI 20.01 [1981 Revision]. Emerson makes no complaint about paragraph "First."

Paragraphs "Second," "Third" and "Fourth" of instruction 7 are based on MAI 25.04 [1978 Revision]. That is the pattern instruction for use in a strict liability case involving a product alleged to have been defectively designed. Committee's Comment (1978 Revision), MAI (3d ed. 1981), p. 345. Emerson makes no complaint about those paragraphs.

It is paragraph "Fifth" of instruction 7 that is the subject of component "B" of Emerson's second point. Paragraph "Fifth" of instruction 7 does not parrot the final paragraph of MAI 25.04. The latter reads:

"... plaintiff was damaged as a direct result of such defective condition as

existed when the (describe product) was sold."

When one compares paragraph "Fifth" of instruction 7 with the final paragraph of MAI 25.04, one observes that the former hypothesizes that the defective condition of the product *directly caused or directly contributed to cause* Gene's death, while the latter hypothesizes that the victim was damaged as a *direct result* of such defective condition.

Paragraph "Fifth" of instruction 7 is based on MAI 19.01 [1986 Revision]. It is set forth below, in its entirety, including its footnotes:

"In a case involving two or more causes of damage, the 'direct result' language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute one of the following:

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.[1]

Third, such negligence either directly caused damage to plaintiff or combined with the [acts of (here describe another causing damage)] [condition of the (here describe product)][2] to directly cause damage to plaintiff.

Notes on Use (1986 Revision)

(Approved July 29, 1986; Effective January 1, 1987)

1. There is no longer a prohibition against using the first alternate where plaintiff is at fault in light of adoption of pure comparative fault in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983).

2. Select the appropriate bracketed phrase.

These modifications may be used whether or not another causing damage is a party."

Emerson makes two complaints about paragraph "Fifth" of instruction 7. The first is that paragraph "Fifth" was taken from MAI 19.01 which, says Emerson, is a "negligence instruction." Emerson points out that inasmuch as this case involved a

product alleged to have been defectively designed, MAI 25.04 was the applicable verdict-directing instruction. Emerson asserts that paragraph "Fifth" of instruction 7 should therefore have conformed to the final paragraph of MAI 25.04 (quoted earlier) by hypothesizing that Gene was killed as a *direct result* of the allegedly defective condition of the track.

Paragraph "Fifth" of instruction 7, as we have seen, was instead taken from the first of the two paragraphs "Third" of MAI 19.01 (quoted earlier), and hypothesized that the defective condition of the track *directly caused or directly contributed to cause* Gene's death.

Emerson points out that when an MAI instruction is applicable its use is mandatory, *Bueche v. Kansas City*, 492 S.W.2d 835, 840[4] (Mo. banc 1973), and that modification of an MAI instruction constitutes error, its prejudicial effect to be judicially determined. *Venable v. S.O.R., Inc.*, 713 S.W.2d 37, 40 (Mo.App.1986).

Plaintiffs respond that using the first paragraph "Third" of MAI 19.01 instead of the final paragraph of MAI 25.04 as the model for paragraph "Fifth" of instruction 7 was specifically authorized by MAI 19.01. Plaintiffs point to the passage from MAI 19.01 which states that in a case involving two or more causes of damage the "direct result" language might be misleading, therefore a plaintiff has the option of substituting one of the two paragraphs "Third" of MAI 19.01. Consequently, say plaintiffs, there was no MAI deviation.

We hold that plaintiffs' understanding of MAI 19.01 is correct. We disagree with Emerson's characterization of MAI 19.01 as a "negligence instruction."

First, MAI 19.01 is not in a section of MAI (3d ed. 1981) containing negligence instructions. It is in its own section (19.-00), captioned "Verdict Directing Modification—Joint Tort–Feasors." While MAI 19.-01 does refer to the "direct result" language of verdict-directing instructions such as MAI 17.01 and 17.02 (negligence instructions), the same "direct result" language of those instructions appears in MAI 25.04, the pattern instruction for use in a strict liability case involving a product alleged to have been defectively designed.

Compare:

MAI 17.01 [1980 Revision]:

"... as a direct result of such negligence plaintiff sustained damage."

MAI 17.02 [1980 Revision]:

"... as a direct result of such negligence, plaintiff sustained damage."

MAI 25.04 [1978 Revision]:

"... plaintiff was damaged as a direct result of such defective condition as existed when the (describe product) was sold."

Second, MAI 19.01 does not state its use is limited to negligence cases. It allows a plaintiff to use one of the two paragraphs "Third" in cases "involving two or more causes of damage." Damage can be caused by a defective product, not just by negligence.

Third, the second paragraph "Third" of MAI 19.01 submits that the negligence hypothesized in the verdict-directing instruction either directly caused damage to the plaintiff or combined with the condition of the allegedly defective product to directly cause damage to the plaintiff. That language unmistakably demonstrates that MAI 19.01 is not limited to negligence submissions.

Moreover, the "directly caused or directly contributed to cause" language of paragraph "Fifth" of instruction 7 is a correct statement of the causation element in a strict liability case based on an allegedly defective product. In *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986), the plaintiffs alleged an airplane crashed because the elevator trim tab actuators had been defectively designed by the manufacturer. The manufacturer maintained that the sole proximate cause of the crash was negligent installation of the actuators by mechanics employed by the airplane's owner. Affirming a judgment against the manufacturer, the Supreme Court of Missouri said:

"[The manufacturer's] argument, though admittedly appealing from a distance, falls shy of the mark upon closer inspec-

tion. Under established principles of causation, the proximate cause of an event or injury need only be a substantial, factor or efficient causal agent." *Id.* at 381[2].

Paragraph "Fifth" of instruction 7 told the jury that in order to return a verdict for plaintiffs the jury had to find that the defective condition of the track "directly caused or directly contributed to cause" Gene's death. If the allegedly defective condition of the track directly caused or directly contributed to cause Gene's death, such condition was obviously a "substantial factor or efficient causal agent" of Gene's death within the meaning of *Nesselrode*.

Although the issue was not squarely presented in *Earll v. Consolidated Aluminum Corp.*, 714 S.W.2d 932 (Mo.App. 1986), that case should be noted. There a man was injured because of an allegedly defective ladder. The jury was instructed (per MAI 19.01) to return a verdict for him and his wife if the jury believed, among other things, that the allegedly defective condition either directly caused or directly contributed to cause the plaintiffs' damages. The plaintiffs lost in the trial court, thus the appeal was by them and their verdict-directing instructions were not challenged. The Eastern District of this Court nonetheless stated that the instructions properly submitted the elements essential to the plaintiffs' recovery. 714 S.W.2d at 937[4].

As to whether the instant case was one involving two or more causes of damage—a requirement for using one of the two paragraphs "Third" of MAI 19.01—we noted earlier that plaintiffs sued three defendants: Emerson, R & G, and the City of Springfield. Plaintiffs pled the City was negligent in sundry respects including failure to isolate the power line, failure to trim the trees, maintaining the line too close to the trees and other derelictions.

On June 16, 1988, plaintiffs dismissed their claim against the City without prejudice. On July 20, 1988, Emerson filed a

motion for leave to file a third-party petition against the City. That motion was granted August 1, 1988, the day before the trial commenced. Emerson's petition against the City averred the City was negligent in the same respects pled by plaintiffs against the City and that Gene died as a direct result of the City's negligence "and/or" his own actions. Emerson sought indemnity from the City in any amount Emerson was forced to pay plaintiffs. Emerson's claim against the City remains pending,[4] hence Emerson can scarcely deny this case involves two or more causes of damage. Emerson's first complaint about paragraph "Fifth" of instruction 7 is without merit.

■ Emerson's second complaint about paragraph "Fifth" of instruction 7 is that MAI 19.01 is applicable only when there are joint tort-feasors. Emerson points out it was the only remaining defendant when the case was tried. Emerson's complaint is fully answered by the final sentence of the "Notes on Use" for MAI 19.01 (quoted earlier), which states that the modifications authorized by MAI 19.01 "may be used whether or not another causing damage is a party." The Notes on Use following an instruction in MAI dictate the circumstances under which the instruction may be used. *Vest v. City National Bank and Trust Co.*, 470 S.W.2d 518, 520[1] (Mo. 1971). Component "B" of Emerson's second point is denied.

■ Emerson's third point has two components. Component "A" asserts the trial court erred in allowing plaintiffs' lawyer to comment during closing argument that Emerson had failed to call competitors to testify concerning the "viability" of Emerson's product. Emerson maintains that (a) any such witnesses were equally available to plaintiffs, and (b) plaintiffs had previously obtained an order from the trial court precluding Emerson from presenting such testimony.

---

**4.** As explained in footnote 1, *supra*, plaintiffs settled with R & G before trial. The trial court severed Emerson's claim against the City from

plaintiffs' claim against Emerson. Only the latter was tried. This ruling is the subject of Emerson's sixth point, discussed *infra*.

Component "A" of Emerson's third point is based on the following dialogue:

"[Plaintiffs' lawyer]: ... Did it ever impress you, as it has me, that no one of Emerson's competitors was in here testifying that no, this really doesn't comply with the standards. And we don't have any complaint that—

[Emerson's lawyer]: —Excuse me, your Honor. I object to that as an improper comment for some competitor, if [plaintiffs' lawyer] would have wanted to call they would have been equally available to him as to anyone else.

THE COURT: Objection is overruled.

[Plaintiffs' lawyer]: Doesn't it impress you that no one from Warner Ladder Company or Keller Ladder Company came in and said: no, this really does comply and this really is all right and there really is no complaint about this product. Emerson doesn't pay very much attention to the ladder safety standards. They don't pay much attention to what their competitors are doing. But they will listen to your verdict...."

In determining the propriety of argument the challenged comment must be interpreted in light of the entire record rather than in isolation. *Lewis v. Bucyrus-Erie, Inc.*, 622 S.W.2d 920, 926[8] (Mo. banc 1981).

In the instant case there was an issue as to whether the ANSI standards for a sectional ladder were applicable to the subject track. That question hinged on whether the track was a ladder within the meaning of the standards.

The question was debated at a pretrial conference. Plaintiffs argued that the standards applied; Emerson argued that they didn't, hence they were inadmissible. The trial court ruled that whether the track was a ladder was a fact issue.

Plaintiffs' expert Greene testified that the ANSI standards limiting the length of a heavy duty or extra heavy duty sectional ladder—the ANSI definition of a sectional ladder appears earlier in this opinion—applied to the track.

Louisville's executive Monohan testified the ANSI standards for ladders did not apply to the track. Emerson also presented testimony by the dean of engineering at New Mexico State University, a professor of civil engineering at the University of Wisconsin, and a consulting safety engineer from Virginia. Each of them agreed with Monohan.

In rebuttal, plaintiffs called an associate professor of electrical engineering at the University of Oklahoma. He testified that the "thirty-foot length rule" of the ANSI standards for metal ladders applied to the track.

Emerson begins its argument on component "A" of its third point by acknowledging the well-established rule that failure of a party to call a witness having knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to proffer it. *Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790[8] (Mo. banc 1983). Emerson reminds us, however, that it is improper for a party to argue the negative inference resulting from his opponent's failure to produce such a witness if the witness is equally available to both parties. *Id.* at 790[9]. Failure to sustain an objection to such an improper argument constitutes prejudicial error. *Id.* at 790[10].

Emerson asserts that before any adverse inference can be drawn from the failure of a party to call a witness, the party attempting to argue such inference must show that the missing witness had knowledge of pertinent facts and was qualified to testify concerning the facts in issue. *Arie v. Intertherm, Inc.*, 648 S.W.2d 142, 155[19] (Mo.App.1983). Emerson maintains plaintiffs made no showing that any witness was available to testify concerning the safety of the track. Additionally, says Emerson, its competitors were clearly as available to plaintiffs as to Emerson. Indeed, argues Emerson, a competitor could be expected to testify unfavorably to Emerson because of business competition.

Our first observation is that component "A" of Emerson's third point is not preserved for review. The only paragraph of

Emerson's motion for new trial pertaining to jury argument is paragraph 5. That paragraph complains that the trial court erred in allowing plaintiffs' lawyer to comment during closing argument that Emerson "did not call a competitor to testify concerning the viability of product modification, specifically the insulating link."

The gist of the segment of the jury argument by plaintiffs' lawyer identified by Emerson in its brief, as we comprehend such argument, is that Emerson presented no testimony from a competitor that the track involved in the instant case complied with the "standards"—presumably the ANSI standards. Nothing in that segment of the argument mentioned the "viability of product modification" or an "insulating link."

Earlier in his argument to the jury, plaintiffs' lawyer stated Emerson's competitors would agree that the track is defective because all of them make insulated ladders and do not make any single ladders over 30 feet long. If that is the comment to which Emerson intended to refer in paragraph 5 of its motion for new trial, we note that Emerson's lawyer registered no objection to that comment at trial.

As the claim of error in component "A" of Emerson's third point was not set forth in Emerson's motion for new trial it cannot be asserted here. *Lott*, 378 S.W.2d at 485[4]. Even if it could, it would be unavailing.

The argument of plaintiffs' lawyer quoted earlier was not a comment on Emerson's failure to call a particular person as a witness. Instead, it was an argument of the type presented in *Lewis*, 622 S.W.2d 920. There a crane operator was injured when the crane toppled. He and his wife sued the manufacturer, claiming the crane was defectively designed in that it lacked a device to warn of overload and imminent danger of tipping. The manufacturer's lawyer made the following argument to the jury:

"Did they bring in one person, one person, to say that these things [load indicator devices] were reliable? Not one person came into court. How about some-body from one of these companies, bringing one of them in? How about bringing one of them in and showing you folks—[at this point, plaintiffs' objection was overruled].... Members of the jury, I started out saying the burden of proof is on the plaintiffs and if the plaintiffs wanted to call one of these manufacturers to come in and tell you just how wonderful their new product is they could have done that.... but they didn't do it. They didn't do it." *Id.* at 926.

On appeal from an adverse judgment the crane operator and his wife asserted the argument impermissibly implied that testimony of the uncalled witnesses would have been unfavorable, when the potential witnesses were equally available to each party. The Supreme Court of Missouri rejected the contention, holding that the thrust of the argument was that the plaintiffs had failed in their burden of proving the crane was defective absent a load indicator device. *Id.*

The argument of plaintiffs' lawyer in the instant case, quoted earlier, was of the same tenor, i.e., Emerson presented no testimony by anyone from any other ladder manufacturer that the track involved in the instant case complied with the "ladder safety standards." Compliance, or lack thereof, was an issue in the case. The import of the argument, like the one in *Lewis*, was that Emerson had failed to present persuasive evidence that the track complied.

As to Emerson's contention that the argument was improper because plaintiffs had obtained an order from the trial court precluding Emerson from presenting such testimony, we find no support therefor in the record. The trial court did grant a request in limine by plaintiffs that Emerson be directed to make no reference to the fact that its competitors manufacture and sell "the same type ladder out of the same aluminum material" without first approaching the bench. That ruling did not bar Emerson from presenting testimony by someone in the ladder industry that the track complied with the "ladder safety standards." Component "A" of Emerson's third point is without merit.

■ Component "B" of Emerson's third point complains about eight alleged references to it as a "large corporation" by plaintiffs' lawyer during voir dire. An examination of the record reveals that Emerson overstates the essence of the comments.

The first comment was an inquiry by plaintiffs' lawyer as to whether any member of the venire believed "large corporations just don't make mistakes." The second was whether any venireman believed large corporations are less likely to make defective products than small corporations or family companies. The third was whether anyone would tend to excuse a corporation if it manufactured a thousand non-defective products but maybe just one defective product. The fourth was whether anyone believed Emerson, because it is a large corporation, should be treated any differently than any other citizen. The fifth was an inquiry as to whether anyone had purchased any products produced by Emerson or its subsidiaries. The sixth was a statement that the "ladder" was made by a division of Emerson called Louisville Ladder Company, "[j]ust like Chevrolet is a division of General Motors, Louisville ... is a division of Emerson." The seventh was an inquiry as to how many veniremen (or members of their families) were then or had ever been an employee of a large corporation. The eighth instance was when a venireman responded to the preceding question by asking how counsel defined a large corporation. When the venireman pointed out that "Sam Walton's is a family corporation," plaintiffs' lawyer responded he would say "over 200 employees."

Emerson voiced no objection to any of the comments in the preceding paragraph.

Over 30 pages later in the transcript, during the lunch recess, Emerson moved for a mistrial because of the references to it as a "large" corporation. The trial court denied the motion.

■ Generally, failure to object to an argument or statement at the time it is made to a jury results in a waiver of any right to complain about the argument or statement on appeal. *Mueller v. Storbakk-*

*en,* 583 S.W.2d 179, 186[6] (Mo. banc 1979); *Glasscock v. Miller,* 720 S.W.2d 771, 777[7] (Mo.1986).

Moreover, plaintiffs' voir dire inquiries concerned subjects about which plaintiffs were entitled to ask. A venireman who is prejudiced against personal injury actions against large corporations may properly be challenged for cause by a widow suing a large corporation for the alleged wrongful death of her spouse. *Vessels v. Kansas City Light & Power Co.,* 219 S.W. 80, 85–86 (Mo. banc 1920). In *McCormick v. Smith,* 459 S.W.2d 272 (Mo.1970), a farm worker suing for injuries sustained when his hand became caught in a combine challenged nine veniremen because each owned or had owned a combine made by the same manufacturer. The trial court granted the challenges; the ruling was upheld on appeal. *Id.* at 277.

Finally, Louisville's executive Monohan, under questioning by *Emerson's lawyer* on *direct examination,* testified that Louisville has "just under five hundred employees," that Louisville is a "subsidiary" of Emerson, and that Louisville, like most of Emerson's divisions, operates autonomously. That testimony unquestionably demonstrated Emerson is a large corporation, thus the jurors were not told anything by plaintiffs' lawyer during voir dire that they did not learn from Emerson's evidence.

The three cases cited by Emerson in support of component "B" of its third point— *Green v. Ralston Purina Co.,* 376 S.W.2d 119 (Mo.1964), *Welch v. Sheley,* 443 S.W.2d 110 (Mo.1969), and *Hawley v. Merritt,* 452 S.W.2d 604 (Mo.App.1970)—did not involve voir dire inquiries comparable to those in the instant case.

The trial court is vested with broad discretion in the control of counsel's conduct during voir dire and its ruling thereon will not be disturbed unless the facts indicate a manifest abuse of discretion. *Anderson v. Burlington Northern Railroad Co.,* 700 S.W.2d 469, 473[2] (Mo.App.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1974, 90 L.Ed.2d 657 (1986); *Missey v. Kwan,* 595 S.W.2d 460, 462[2] (Mo.App.1980). Even had Emerson's complaint about the com-

ments of plaintiffs' lawyer during voir dire been timely, the trial court would not have been guilty of abusing its discretion in denying Emerson's motion for mistrial.

Component "B" of Emerson's third point identifies one other instance where plaintiffs' lawyer allegedly referred to Emerson as a "large corporation." This was during opening statement when plaintiffs' lawyer said:

"... they say this isn't a ladder. But every time you try to—and do you know what they called it before 1979? They called it a ladder.

From 1959 when they started manufacturing this at a lesser height, through 1979 when they manufactured it at forty-four feet, they called it a ladder.

The safety standard was passed and they said we're going to start calling it a hoist. But it's hard, when you're a corporation the size of Louisville Ladder or any size to change everything to erase—

[Emerson's lawyer]: Excuse me, your Honor. May we approach the bench."

At sidebar Emerson objected and moved for a mistrial. The trial court sustained the objection but denied the motion for mistrial. At Emerson's request, the trial court admonished the jury to disregard "the last statement" of plaintiffs' lawyer.

■ A trial court is in a better position than a reviewing court to judge the prejudicial effect, if any, of an allegedly improper comment in opening statement, and of necessity is vested with considerable discretion in determining what corrective action is required. *Martin v. Sloan*, 377 S.W.2d 252, 259–60[9] (Mo.1964). A trial court's decision denying a motion for mistrial because of improper remarks during opening statement will not be disturbed on appeal unless the trial court clearly abused its discretion. *State ex rel. State Highway Commission v. Drisko*, 537 S.W.2d 645, 648[2, 3] (Mo.App.1976).

In *North County School District R-1 v. Fidelity & Deposit Company of Maryland*, 539 S.W.2d 469 (Mo.App.1976), the plaintiff's lawyer was discussing a performance bond during closing argument; he stated: "[I]t's something where a com-

pany, a big insurance company—." *Id.* at 475. At that point an objection was made and a mistrial was requested. The trial court sustained the objection but declined to grant a mistrial. Upholding that ruling, the appellate court held that while a comparison between the size, power or wealth of the litigants is wholly extraneous and should not be made by counsel, objection was made immediately and sustained. The appellate court found no abuse of discretion in failing to declare a mistrial. *Id.* at 480–81[16].

Trial in the instant case consumed ten days. Plaintiffs' lawyer made the opening statement on the second day. Emerson immediately objected and the trial court granted all the relief requested by Emerson except a mistrial. The comment by plaintiffs' lawyer was not so much a comparison between the size, power or wealth of the litigants as it was a remark about Louisville's inability to get its personnel to begin calling the ladder a track. Recognizing that the trial court was in a better position than us to determine the prejudicial effect, if any, of the comment, we cannot convict the trial court of an abuse of discretion in denying the motion for mistrial. Component "B" of Emerson's third point is denied.

Emerson's fourth point avers the trial court erred in admitting Plaintiffs' Exhibit 82, the ANSI design standards for ladders. Emerson maintains the standards specifically exclude "hoisting equipment" such as the track platform hoist in the instant case. According to Emerson, the standards were admitted without foundation and plaintiffs failed to produce any evidence indicating that any violation of the standards caused Gene's death.

Prior to trial Emerson filed a motion in limine regarding sundry items, one of which was the ANSI design standards for ladders. Emerson asked the trial court to bar plaintiffs from mentioning the standards or presenting any evidence about them.

At a pretrial conference Emerson argued that the track was part of a platform hoist,

that the ANSI standards for ladders do not apply to platform hoists, and that any reference to the ANSI standards for ladders would inject a false issue before the jury. Emerson directed the trial court's attention to a passage on page 9 of the standards, footnoted below.[5]

Plaintiffs replied that at the time of Gene's death the track was being used as a ladder, that the power equipment was "not even out of the shed," and that plaintiffs' experts would say that the 30–foot length restriction on "single ladders" should apply to the track. Additionally, argued plaintiffs, the standards required certain "safe use instructions" to be put on ladders.

The debate occupies some 18 pages of the transcript. Nowhere therein do we find any objection by Emerson on the ground that the standards were immaterial because Gene's death did not result from any violation of them.

The trial court denied the paragraph of Emerson's motion in limine regarding the standards.

At trial plaintiffs' expert Greene was asked on direct examination whether there were standards "that deal with how long ladders should be." Greene replied, "Yes, maximum length." Greene was then shown Exhibit 82 and identified it as the ANSI "Safety Requirements for Portable Metal Ladders." Plaintiffs' lawyer then asked Greene if he had an opinion as to whether the "ladder" involved in the instant case was the kind of ladder "governed by ANSI." Greene answered it was his opinion that "the portions of ANSI do deal directly with this ladder." Plaintiffs' lawyer asked Greene whether the ANSI

section limiting the length of ladders applied. Greene responded, "Yes, it does." Greene identified the provision as § 6.2.3.

Emerson voiced no objection to the above testimony.

Plaintiffs thereupon offered Exhibit 82 in evidence. Emerson's lawyer said, "Subject to prior discussions, prior objections."

The trial court received Exhibit 82 in evidence.

Emerson relies on the following evidence in support of its contention that the ANSI standards do not apply to the track.

First, Greene acknowledged on cross-examination that the standards themselves provide that they do not apply to "hoisting equipment" or "special purpose ladders that do not meet the general requirements" of the standards.[6] Greene did not, however, testify that the track came within either of those exceptions or any other exception. He did concede, on cross-examination, that when his deposition was taken he had said: "This is not a code problem. I'm not criticizing the manufacturer because they don't necessarily meet all the code requirements." Greene also admitted he had been asked on deposition whether the fact that the track was longer than 30 feet had anything to do with Gene's death, and that he (Greene) had answered: "No. Because there was no loss of control of the ladder."

Second, Emerson points to the testimony of Louisville's executive Monohan who avowed that the ANSI standards for portable aluminum ladders do not apply to the track because "it is not a ladder." Mono-

---

5. Plaintiffs' Exhibit 82, a document titled "American National Standard Safety Requirements for Portable Metal Ladders," provides:

"**1.1 Scope.** This standard prescribes rules governing the safe construction, design, ... and use of portable metal ladders of various types including, but not limited to, ... portable extension, ... sectional, combination, single, and platform ladders, but excluding ladders in and on mines, the fire services, mobile equipment, hoisting equipment, work platforms, antenna communications towers, transmission towers, utility poles, and chimneys. It does not cover special-purpose lad-

ders that do not meet the general requirements of this standard. . . .

This standard also prescribes rules and minimum requirements for labeling of the common types of portable ... extension ladders, and single ladders, in order to ensure safety under normal conditions of usage. It does not cover ... platform ladders, trestle ladders, extension trestle ladders, and combination ladders, nor does it apply where training, supervision, or established safety procedures are in conflict with or serve in lieu of this standard."

6. Footnote 5, *supra*.

han asserted: "I know it looks like a ladder but it is not a ladder, it's the bed-way for the hoist platform, it's a special purpose product. And it was designed solely for the hoist platform."

Third, Emerson directs us to the testimony of the dean of engineering at New Mexico State University who testified on cross-examination that he did not think the ANSI code applied to the track because it "is not a ladder."

Fourth, Emerson reminds us that the professor of civil engineering at the University of Wisconsin (who serves on the ANSI steering committee that deals with wood, steel, aluminum and fiberglass ladders) testified that the track did not "come under the ANSI standards." The professor also testified that even if the track did come under the standards, it did not violate the standards or the "spirit" of the standards.

Plaintiffs respond by pointing out that in addition to the testimony presented by Greene just before Exhibit 82 was received in evidence, the track was referred to as a "ladder" by several witnesses at trial. We have noted that testimony in our discussion of component "A" of Emerson's second point. Additionally, plaintiffs emphasize that the track was called nothing but a ladder by Louisville until 1979, and even after that it was referred to as a ladder from time to time in Louisville's documents. That evidence is set forth earlier in this opinion.

Plaintiffs also remind us that the dean of engineering at New Mexico State University—one of Emerson's experts—called the track a ladder in the course of conducting tests on it.

Furthermore, say plaintiffs, Louisville's executive Monohan admitted that but for the fact that the track was not supposed to be climbed, it fits the ANSI definition of a sectional ladder. Monohan also conceded it is reasonably foreseeable to Louisville that the track will be used like a ladder, and that nothing on the track warns a user not to climb it. That evidence is noted earlier in this opinion.

Finally, there was evidence that the track is sold separately from the hoisting equipment. Plaintiffs maintain that sold separately, the principal use of the track could be nothing but a ladder. The associate professor of electrical engineering at the University of Oklahoma, called as a witness by plaintiffs in rebuttal, testified, "If the ladder is sold separately without the hoisting mechanism, it looks like a ladder, it acts like a ladder, it can be used as a ladder, it has the same rung spacing, it has the same rungs, it basically is a ladder." The professor testified that the "thirty-foot length rule" in the ANSI standards for metal ladders applied to the track.

While industry customs or standards do not establish a legal standard of care, evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached. *Pierce,* 769 S.W.2d at 772. In the instant case there was substantial evidence by plaintiffs that the ANSI standards applied to the track and substantial evidence by Emerson that they did not. In such circumstances the admissibility of the standards was a determination to be made by the trial court in the exercise of its discretion, and on the record here we cannot convict the trial court of abusing its discretion in receiving the standards in evidence. *Dixon v. International Harvester Co.,* 754 F.2d 573, 582 (5th Cir.1985).

As to Emerson's contention that the standards were immaterial because plaintiffs failed to prove Gene's death was caused by a violation of them, we mentioned earlier that we are unable to find any objection by Emerson on that ground prior to the receipt of the standards in evidence. An appellate court will not, on review, convict a lower court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach,* 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed,* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983); *ASARCO, Inc. v. McNeill,* 750 S.W.2d 122, 129[4] (Mo.App. 1988).

However, even had such an objection been made it would have been futile.

While plaintiffs' expert Greene testified on deposition that the fact that the track was longer than 30 feet had nothing to do with Gene's death in that there was "no loss of control of the ladder," plaintiffs presented evidence that had the track complied with the 30–foot length requirement Gene would not have been electrocuted. That evidence came from the associate professor of electrical engineering at the University of Oklahoma. He testified he found a number of "burn marks" within "about three and a half inches of the end of the ladder." The witness concluded those were the places where the track became energized with electricity. He testified, "[I]f they were raising the ladder with a base in the same place, and they were raising a thirty foot ladder, since the burn marks are out here on the end of a forty-foot ladder, the thirty foot ladder would have missed the location of the burns by at least ten feet." Additionally, as reported earlier, a line foreman for the electric utility, testifying for Emerson, found aluminum flakes metal melted into three holes in the power line. The evidence set forth in this paragraph was sufficient to present a jury issue on the causation element. Emerson's fourth point is without merit.

 Emerson's fifth point has two components, each of which complains about the receipt in evidence of testimony from expert witnesses. Emerson avers such testimony "was outside the scope of the discovery previously propounded by plaintiffs, such that this evidence was without foundation, constituted unfair surprise, and precluded Emerson from effectively responding to such testimony." Component "A" of the fifth point pertains to witness William Westley.

Plaintiffs presented Westley's testimony by reading excerpts from a deposition given by him in February, 1988. At that time Westley was vice president and plant manager of R & G, which was then a defendant in this action along with Emerson and the City of Springfield. Plaintiffs and all three defendants were represented by counsel at the deposition.

On June 21, 1988, R & G, in response to an interrogatory propounded to it by plaintiffs asking R & G to identify each person it expected to call as an expert witness at trial, answered: "William C. Westley will act as corporate representative for [R & G] and also Mr. Westley may be called as an expert witness. Mr. Westley's field of expertise and educational background and the subject matter on which he would be expected to testify is all set forth in his deposition...."

On July 12, 1988, while R & G was still a defendant, plaintiffs, in response to an interrogatory propounded by Emerson asking plaintiffs to identify each person they expected to call as an expert witness at trial, filed a supplemental answer stating: "In addition, plaintiffs reserve the right to offer testimony by any witnesses designated as experts by other parties."

On July 22, 1988, plaintiffs filed a document styled "Plaintiffs' Offers from the Deposition of William C. Westley" identifying some 70 portions of Westley's deposition.

On August 1, 1988, the day before the trial commenced, the trial court filed an order approving settlement of plaintiffs' claim against R & G.[7] At a pretrial conference that day Emerson's lawyer, referring to plaintiffs' intention to present portions of Westley's deposition, stated: "... they have asked many expert type opinions from Mr. Westley. They've not designated him as an expert in their case. He's no longer a party to this case."

When plaintiffs pointed out that they had previously reserved the right to offer testimony by any witnesses designated as experts by other parties, and that Westley had been designated as an expert by R & G while it was still a defendant, Emerson's lawyer asserted: "He is not a party, he has not been designated as an expert. In addition, his training and experience does not qualify him as an expert. As long as he was a party anything he said could be held against [R & G] but I certainly don't believe it's binding on Louisville Ladder in

7. Footnote 1, *supra.*

any way.... There's no reference here within a week ago that they were trying to call as an expert somebody that's no longer a party, and that's their last announcement on it."

Plaintiffs responded that their offers from Westley's deposition were on file before plaintiffs' settlement with R & G was approved, hence Emerson "well knew we were offering Westley."

The trial court made no ruling on the issue that day (August 1, 1988).

During trial, outside the hearing of the jury, the trial court asked Emerson's lawyer if he wanted to make a record on his objections to "anything from Mr. Westley." Emerson's lawyer reiterated the earlier arguments and added that had Emerson known plaintiffs intended to present Westley's deposition testimony Emerson would have taken Westley's deposition. Emerson's lawyer stated that when Westley's deposition was taken Westley was not listed as an expert, consequently Emerson's lawyer asked him no questions.

Plaintiffs' lawyer again reminded Emerson's lawyer that plaintiffs had previously informed Emerson that plaintiffs reserved the right to offer testimony by any witnesses designated as experts by other parties.

The trial court overruled Emerson's objection and also overruled an objection by Emerson that there was "insufficient foundation in the deposition" to qualify Westley as an expert "in all areas that they are offering his opinions on." The trial court then took up objections by Emerson to specific portions of Westley's deposition, sustaining some and overruling others.

The portion of Westley's deposition presented by plaintiffs revealed, among other things, that R & G sells components for track platform hoists to Louisville, that the platform hoists are generally sold to people in the roofing and construction industry, that R & G knew power lines were suspended at heights lower than 40 feet, and that as a ladder gets longer it becomes more difficult to control when being raised and lowered.

We first address Emerson's assertion that the trial court should have rejected Westley's testimony in toto because plaintiffs failed to name him as an expert witness in their answers to interrogatories. While it is true that plaintiffs never identified Westley by name in such answers, it is equally true that R & G, while it was a party, not only designated Westley as an expert witness but also stated that the subject matter of his testimony was all set forth in his deposition. Emerson was thus notified of the possibility that Westley would be a witness and, in addition, was informed of the subject matter of his testimony. Emerson evidently perceived no necessity of deposing Westley at that time. Later, while R & G was still a defendant, plaintiffs' supplemental answer to Emerson's interrogatory put Emerson on notice that plaintiffs reserved the right to offer testimony by any witnesses designated as experts by other parties. Westley was indisputably a witness designated as an expert by another party, R & G. In these circumstances Emerson's claim that it was unfairly surprised when plaintiffs, on July 22, 1988, identified portions of Westley's deposition that plaintiffs intended to offer at trial, rings hollow.

Why it was unnecessary for Emerson to depose Westley if he was to be called as an expert witness by R & G, but suddenly became essential to depose him if plaintiffs intended to read portions of his deposition—taken some six months before trial—is unexplained.

The cases cited by Emerson in support of its assertion that the trial court should have excluded Westley's deposition testimony do not present facts such as those here. We do, however, learn from them that appellate courts give great deference to the exercise of trial court discretion regarding rulings on issues arising from pretrial discovery and the determination of the appropriate course of action in the event of noncompliance with a discovery rule. *Ellis v. Union Electric Co.*, 729 S.W.2d 71, 74[2] (Mo.App.1987). Appellate courts look only for an abuse of this broad discretion which results in prejudice or unfair surprise. *Id.* A trial court has authority to impose sanc-

tions against a party who fails to comply with discovery, but prior to imposing sanctions on the errant party the trial court must first determine whether, in a particular situation, the opposing party has been prejudiced. *State ex rel. Missouri Highway and Transportation Commission v. Pully*, 737 S.W.2d 241, 245[5] (Mo.App. 1987).

We find no abuse of discretion by the trial court here.

First, Emerson is hard pressed to claim surprise. Westley's identity and the content of his deposition became known to Emerson when the deposition was taken some six months before trial. Emerson knew Westley might appear as an expert witness, as R & G had specifically designated him as such. Additionally, plaintiffs had put Emerson on notice that they were reserving the right to offer testimony by any witnesses designated as experts by other parties.

Second, plaintiffs did not present Westley in person and adduce testimony from him beyond that which appeared in his deposition. Plaintiffs presented only excerpts from the six-month-old deposition. Emerson cannot claim it was unaware of that testimony.

Third, Emerson did not identify to the trial court any aspect of Westley's testimony about which Emerson needed to depose him.

Emerson's assertion that the trial court should have rejected Westley's deposition testimony in its entirety is without merit.

Emerson also complains that Westley's testimony was received without foundation to qualify him as an expert.

The excerpts from Westley's deposition presented by plaintiffs occupy 18 pages of the transcript. While most of the testimony pertains to facts instead of opinion, there are some answers that arguably constitute "expert" testimony. We fail, however, to find anyplace where any objection to a specific answer on the ground that it constituted "expert" testimony was made by Emerson to the trial court and overruled. While the trial court did consider objections by Emerson to specific portions of Westley's deposition, sustaining some and overruling others, the record reveals neither the grounds of the overruled objections nor the segments of Westley's deposition to which they were directed.

Emerson's brief refers us to testimony by Westley about the track being difficult to control under certain circumstances and about "warnings and instructions." Emerson fails, however, to direct our attention to anyplace in the record where objection was made to any particular question or answer regarding those subjects on the ground that Westley was not qualified to express an opinion thereon.

Where objection is made to all of the testimony of a witness, some of which is competent, the objection is properly overruled. *Albert v. Dolan*, 27 S.W.2d 438, 441[6] (Mo.App.1930). *Accord: Lach v. Buckner*, 229 Mo.App. 1066, 86 S.W.2d 954, 960[6] (1935). It was not incumbent on the trial court, on its own motion, to go through the portions of Westley's deposition offered by plaintiffs and "attempt to separate the wheat from the chaff." *In re Pate*, 232 Mo.App. 478, 119 S.W.2d 11, 13 (1938). Hence there was no error in admitting the excerpts over the objections as made. *Pate*, 119 S.W.2d at 13. *Cf. Allen v. St. Louis Public Service Co.*, 365 Mo. 677, 285 S.W.2d 663, 667–68[8] (1956). Component "A" of Emerson's fifth point is denied.

Component "B" of Emerson's fifth point complains that plaintiffs' expert Greene testified "concerning a prototype insulating link, although such testimony was outside the scope of Greene's previously taken deposition, and plaintiffs failed to notify counsel for Emerson of Greene's additional testing and opinions prior to trial, despite an agreement by counsel to do so."

During Greene's direct examination at trial he was asked by plaintiffs' lawyer whether he had considered how he would put an insulating link in the "ladder" involved in the instant case. Greene responded that he had not gone all through the research and development, but had

built a prototype to prove the concept. According to Greene, that was a starting point for what could be done by way of building an insulating link.

Outside the hearing of the jury Emerson's lawyer directed the trial court's attention to a letter from Emerson's lawyer to plaintiffs' lawyer dated July 19, 1988 (13 days before trial was scheduled to commence), asking plaintiffs' lawyer to advise Emerson's lawyer if Greene had "formed any other opinions regarding any issues, performed any tests, or fabricated any track prototypes since his deposition." If so, said the letter, Emerson requested copies of this "additional work" and "a summary of any new opinions."

Plaintiffs' lawyer told the trial court that Emerson's lawyer should not be surprised about the concept of the insulating link. Plaintiffs' lawyer continued: "The only thing that's new is them looking at this object because he described in his deposition exactly how it would be designed, what it would be made of and the various alternative materials.... And so there's certainly nothing new in terms of concept.... Mr. Greene told them exactly what he was going to do and he did it."

The trial court permitted Greene's testimony to continue.

Greene identified Plaintiffs' Exhibit 70 as an "insulated link designed to separate the ladder and provide protection to workmen handling the ladder." Greene explained he had designed the link and a machinist had made three of them out of micarder, "a type of resin." The purpose of making three was to have two to put in a ladder.

Greene identified Plaintiffs' Exhibit 70–A as a ladder with the links inserted. Exhibits 70 and 70–A were received in evidence over Emerson's objection.

Greene then described how the links were inserted in the ladder and how that part of the ladder was stronger than the original aluminum. Greene added that each inch of the link insulated against 50,-000 volts of electricity, thus a three-inch link would insulate against 150,000 volts.

Emerson's brief makes the bald assertion that Greene's testimony "went far beyond what Greene had testified to in his previously taken deposition." Emerson does not identify any part of Greene's deposition to support this proclamation and Emerson has failed to file the deposition with us.

Emerson concedes that in plaintiffs' supplemental answers to Emerson's interrogatories plaintiffs stated their experts may testify about any of the subjects discussed in their depositions and with regard to any inspections, examinations or other work discussed in their depositions.

Plaintiffs, in their brief, assert that Greene, in his deposition, stated it was completely feasible to produce an insulated link for the ladder, described where the link would be located in the ladder, and drew a diagram to illustrate its location. Additionally, say plaintiffs, Greene discussed some of the appropriate materials from which the link might be made and informed Emerson's lawyer that if Emerson's experts denied the feasibility of producing and incorporating an insulating link into the design, Greene intended to produce a prototype and bring it to trial. Plaintiffs identify the pages of Greene's deposition where this testimony allegedly appears. Inasmuch as the deposition has not been supplied us, we cannot examine that testimony.

▪▪▪ An appellant ordinarily has the burden of establishing prejudicial error on appeal; a respondent does not have the burden of establishing the correctness of the trial court's ruling. *Nash v. Plaza Electric, Inc.*, 363 S.W.2d 637, 641[2] (Mo. 1962). It is the duty of an appellant to furnish a record containing information sufficient for the appellate court to determine the questions on appeal. *Welch v. Welch*, 633 S.W.2d 447, 450[4] (Mo.App. 1982); *Lewis v. Columbia Mutual Insurance Co.*, 588 S.W.2d 161, 162[2] (Mo.App. 1979).

In *Welch*, 633 S.W.2d 447, the appellant claimed a "home study report" was favorable to her and should have been taken into account by the trial court. The appellant failed, however, to include the report in the

record on appeal. The appellate court held that where exhibits are omitted from the transcript and are not filed with the appellate court, the intendment and content of such exhibits will be taken as favorable to the trial court's ruling and unfavorable to the appellant. *Id.* at 450. *Accord: Godsy v. Godsy,* 531 S.W.2d 547, 553[9] (Mo.App. 1975). We shall therefore assume Greene's deposition bears out the averments of plaintiffs' brief.

We have studied the four cases cited by Emerson in support of component "B" of its fifth point. None of them are factually similar to the situation here.

We noted in discussing component "A" of Emerson's fifth point that appellate courts give great deference to the exercise of trial court discretion regarding rulings on issues arising from pretrial discovery. Assuming Greene's deposition contained the testimony described by plaintiffs, we find no abuse of discretion in the respect charged in component "B" of Emerson's fifth point. It is, accordingly, denied.

■ Emerson's sixth point avers the trial court erred in severing Emerson's third-party claim against the City of Springfield from plaintiffs' claim against Emerson for the purpose of trial,[8] and in precluding Emerson from presenting evidence that the City "was the sole cause" of Gene's death. Emerson claims such rulings were erroneous in that (1) one of plaintiffs' expert witnesses testified in an offer of proof that the acts and omissions of the City were the sole cause of Gene's death and Emerson was entitled to present and argue such evidence, and (2) failure to allow consideration of Emerson's claim against the City at the same time as plaintiffs' claim against Emerson has exposed Emerson "to multiple actions and potentially inconsistent verdicts."

We shall first address the issue regarding exclusion of the "sole cause" evidence. The only evidence of that description identified by Emerson in its brief appears in an offer of proof elicited by Emerson's lawyer from the associate professor of electrical engineering at the University of Oklahoma who testified in rebuttal for plaintiffs. The offer:

"[Emerson's lawyer]: Doctor, this is what we call an offer of proof. You have previously testified in depositions that you looked at this case as with respect to City Utilities of Springfield as being at fault, in this accident. Have you not discussed that in your deposition previously?

A Yes, I did.

Q It was your testimony then, sir, when you were under oath, and I assume it is still your testimony, is it not, when asked the question: did fault on the part of City Utilities in your opinion cause this accident. Your answer was yes. Is that still your answer?

A That's true.

Q In fact, sir, your testimony previously, I assume it still is, was that they didn't isolate or insulate these power lines, is that correct?

A Yes.

Q And so we can be clear on that, doctor, by isolating could combine either moving the lines at a higher distance or removing the tree limbs where they could not come into contact with the power lines. Is that a fair statement?

A Yes, sir.

Q Is that your testimony here today?

A Yes, sir.

Q In fact, doctor, regardless of, and in your opinion, they were negligent and deviated from their appropriate duties under the codes and their duties to the public in not doing those things, is that correct?

A Yes.

Q And is it not true, doctor, that regardless of whether this insulating link that we have been discussing about would work or not work, had those lines been effectively isolated, by the tree limbs being removed so no one could come in contact with them, or the power lines isolated where no one could come

---

8. Footnote 4, *supra.*

into contact with them, this accident would not have occurred; correct?

A That's correct."

The trial court rejected the offer.

Emerson acknowledges it is "impermissible to give a sole cause instruction in Missouri," but asserts it should have been allowed "to argue facts which demonstrate that an accident was caused solely by another's negligence." *See: Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491, 493 (Mo. banc 1986). While that proposition may be correct as an abstract statement of law, it does not establish that the trial court's rejection of the "offer of proof" here was erroneous.

The thrust of the tendered testimony was that in the professor's opinion, fault on the part of the City (the owner and operator of the electric utility) caused the accident. The professor, if allowed to testify, would have said that in his opinion the City was negligent in failing to insulate the power line, in failing to isolate it by moving it to a greater height, and in failing to remove the tree limbs near the line. The professor would have expressed the opinion that had those measures been taken the accident would not have occurred.

■■■■ The principles governing the admission and exclusion of opinion testimony by experts appear in *Wessar v. John Chezik Motors, Inc.,* 623 S.W.2d 599 (Mo. App.1981). If the subject is one with which lay jurors are not likely to be conversant, and one where the expert's opinion would be of value to the jury, it is no valid objection that the expert's opinion is upon the ultimate issue to be decided by the jury, or that it invades the province of the jury. *Id.* at 602[1]. *See also: Eickmann v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122, 129–30 (1952). On the other hand, if the subject is one of everyday experience, where the jurors are competent to decide the issues, then opinion testimony is properly rejected. *Wessar,* 623 S.W.2d at 602[1]. The admission or exclusion of expert opinion testimony is a matter within the sound discretion of the trial court. *Eickmann,* 253 S.W.2d at 130[11]. That

discretion is rarely disturbed on appeal. *Wessar,* 623 S.W.2d at 602.

In the instant case there was evidence as to the length of the track at the time Gene was electrocuted, the height of the electric line, the distance of the line from the church, the amount of voltage the line carried, and the position of the tree with respect to the line. The jurors did not need opinion testimony from an associate professor of electrical engineering to aid them in determining whether Gene would have been electrocuted had the line been insulated or isolated, or had the limbs been removed. One does not need expertise in electrical engineering to grasp the concept that an aluminum track 40 feet long will reach an electric line 25 feet above the ground.

Nothing in the trial court's ruling rejecting the offer of proof barred Emerson from (a) presenting evidence regarding the height of the line, the position of the tree, the length of its limbs, the standards for insulating or isolating power lines and trimming limbs near them, or any other *fact* relevant to the electrocution, or (b) arguing to the jury that the City was derelict in one or more of those respects and such dereliction was the cause of Gene's death. The trial court's ruling rejecting the offer of proof pertained only to the specific testimony offered, nothing else. Emerson's contention that the ruling precluded it from presenting evidence that the City's negligence was the sole cause of Gene's death and from arguing that theory to the jury is without merit.

The other complaint in Emerson's sixth point is that the trial court erred in severing Emerson's third-party claim against the City from plaintiffs' claim against Emerson for the purpose of trial.

We have already learned that (a) the City was the lone defendant for the first 14 months of this suit, (b) Emerson and R & G were added as defendants May 27, 1987, (c) plaintiffs dismissed their claim against the City without prejudice June 16, 1988, and (d) Emerson filed a motion for leave to file a third-party petition against the City July 20, 1988. Simultaneously with the filing of

the latter motion Emerson filed a motion for a continuance of the trial on the ground that its motion to file the third-party petition against the City should be granted and additional pleadings and discovery would consequently be required. Emerson's motion for continuance averred there was insufficient time to accomplish all this before the scheduled trial date (August 1, 1988).

On August 1, 1988, the trial court took up Emerson's motion for leave to file the third-party petition and Emerson's motion for continuance, granting the former and denying the latter. Trial commenced the next day. As Emerson's claim against the City was not at issue the trial court severed the third-party claim and tried only plaintiffs' claim against Emerson.

Emerson asserts the trial court's refusal to allow Emerson to try its claim against the City concurrently with plaintiffs' claim against Emerson constituted prejudicial error in that "the testimony was that the City was the sole cause of plaintiffs' injury and failure to allow the jury to consider Emerson's claim against the City at the same time as plaintiffs' claim against Emerson has exposed Emerson to multiple actions and potentially inconsistent verdicts."

A careful reader will observe that this contention appears to conflict with Emerson's earlier assertion that the trial court precluded Emerson from presenting evidence that the City was the sole cause of Gene's death. However, we glean from subsequent argument in Emerson's brief that the gist of its complaint is that the trial court barred such evidence but that such evidence would have been admissible had Emerson's claim against the City been tried simultaneously with plaintiffs' claim against Emerson.

The argument is specious. We have earlier determined that the trial court's rejection of Emerson's offer of proof from the associate professor of electrical engineering did not bar Emerson from presenting evidence that the City's negligence was the sole cause of Gene's death or from arguing that theory to the jury.

The other aspect of Emerson's complaint about the severance is that a separate trial of Emerson's claim against the City will increase the time and money expended by Emerson in litigation and will expose Emerson to potentially inconsistent verdicts. Emerson maintains the severance was contrary to the "public policy" set forth in *Heshion Motors, Inc. v. Western International Hotels*, 600 S.W.2d 526, 536 (Mo. App.1980), i.e., that the purpose of third-party practice is to avoid multiplicity of actions, to minimize time and expense of litigation, to achieve maximum utilization of court facilities and judicial capacity, and to render ultimate justice.

Emerson's argument would be more persuasive if it had seen fit to commence its third-party action against the City earlier than 12 days before the trial was scheduled to begin. Emerson was brought into the case May 27, 1987, and could have filed a cross-claim against the City anytime after that date until June 16, 1988, when plaintiffs dismissed their claim against the City. Not only did Emerson fail to assert any claim against the City during that 13-month interval, it waited more than a month thereafter before seeking leave to file the third-party petition against the City.

While Emerson characterizes the issue as a decision on whether to sever, the question before the trial court was in reality whether the trial would begin as scheduled.

The trial court had established the trial date of August 1, 1988, three and a half months earlier, on April 11, 1988. The need to fix the date for a trial of this magnitude that far in advance is obvious. Expert witnesses from distant locations were presented by both sides. Arranging their appearances obviously required adequate notice. Counsel for the parties needed to clear their schedules. Additionally, the busy trial courts cannot be expected to conduct a trial of this duration on short notice. Summoning a venire of sufficient size to ensure an adequate number of jurors who can spend two uninterrupted weeks at the courthouse is no small task. A trial court must be able to control its docket and cannot reasonably be expected

to schedule, cancel and reschedule major trials at the whim of one of the litigants.

■ The decision on whether to grant a continuance rests largely in the discretion of the trial court, and every intendment is in favor of the trial court's ruling. *Hall v. Williams*, 330 Mo. 473, 50 S.W.2d 138, 139[1, 2] (1932); *Krieber v. Krieber*, 420 S.W.2d 376, 379[3] (Mo.App.1967).

■ In the instant case Emerson had over 14 months to assert a claim against the City. Emerson knew on April 11, 1988, that the trial was set for August 1, 1988. Emerson waited until 12 days before trial was to begin to file its motion for leave to file the third-party petition against the City, obviously realizing that by waiting until then the claim would not be at issue on the scheduled trial date. That is exactly how matters turned out. Given these circumstances we find no abuse of discretion in the trial court's decision to proceed to trial as scheduled on plaintiffs' claim against Emerson. Emerson's sixth point is · denied.

Emerson's seventh point avers the trial court erred in permitting plaintiffs to present testimony concerning what Gene would have done if an instruction manual had been attached to the track platform hoist. Emerson asserts Gene was illiterate, consequently testimony as to what he might have done was speculative, injected a false issue into the case, and confused and misled the jury.

Plaintiffs contended at trial that one of the respects in which the track was defective was that the instructions on how to use it were not affixed to it or otherwise communicated to the user.

According to Louisville's executive Monohan, Louisville supplied a printed instruction manual with each track platform hoist telling the user how to raise and lower the track. There were two methods, each of which required that a rope be tied to the top of the track and that a person on the roof use the rope to control the track as it was being raised and lowered.

Gene Brown testified there was no instruction manual attached to any part of the track platform hoist when it was delivered to him and he never saw such a manual.

Danny Eagleburger testified he never saw an instruction manual.

Emerson's lawyer, during cross-examination of plaintiffs' expert Greene, elicited a concession that if the person using the track was unable to read, written instructions would be meaningless.

Danny Eagleburger testified without objection that Gene could not read. Plaintiffs' lawyer then asked Danny what Gene would have done if he had seen an instruction manual. Over Emerson's objection that the inquiry called for speculation, Danny testified Gene would have gotten someone to read the instructions to him. Danny described an incident where he and Gene bought some tools and Gene had someone read the instructions about them to him.

A day later in the trial Gene's widow confirmed that Gene was unable to read. She recounted that Gene had her read him instructions about tools, documents pertaining to his work, and religious literature. Then, this:

"Q ... let me ask you, was Gene the kind of person if anyone had given him some instruction manual for this ladder out there at the ... Church, he'd have brought that home to you to read to him?

A Yes, sir, he would first take it to Danny's house, it would be read to him there and then they would go through it and then he would bring it home. And that evening we would go through any guarantees or anything that came with any of their tools or anything.

Q Is there any doubt in your mind ... that if this had ever been made available to Gene Eagleburger, that he would have had it read to him?

A He would have brought it home for me to read."

Emerson registered no objection to the above testimony.

■ A complaining party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evi-

dence admitted without objection. *Drining v. Missouri Bone & Joint Clinic, Inc.,* 730 S.W.2d 293, 295[3] (Mo.App.1987). *See also: Dunn v. St. Louis–San Francisco Railway Co.,* 621 S.W.2d 245, 252[7] (Mo. banc 1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982); *Stanziale v. Musick,* 370 S.W.2d 261, 268[9] (Mo. 1963).

■ In the instant case the testimony of Gene's widow as to what he would have done had there been an instruction manual with the track platform hoist was received without objection. That being so, Emerson cannot claim it was prejudiced by the testimony of Danny Eagleburger on the same subject. We therefore need not—and do not—decide whether the receipt of Danny's testimony over Emerson's objection was error. Emerson's seventh point is denied.

Emerson's eighth point is:

"The trial court erred in prohibiting ... Emerson from presenting evidence of alternative methods of performing the work done by decedent at the time of the accident in question because such evidence was permissible to show that decedent voluntarily and unreasonably exposed himself to a known danger, and contributory fault is a defense in a strict product liability action." [9]

Plaintiffs assert that the point presents nothing for review in that it does not identify any specific evidence that was excluded or any particular ruling of the trial court excluding it. A point relied on that fails to identify the challenged ruling presents nothing for review. *Thummel,* 570 S.W.2d at 685; *Albers,* 740 S.W.2d at 662[1].

We have nonetheless gratuitously scrutinized the argument portion of Emerson's brief in an effort to identify the rulings about which Emerson endeavors to complain. While the argument refers to evidence concerning "alternative methods of performing the work," "failure to use proper safety equipment," and other vaguely described evidence, no transcript references are supplied. It is not the duty of an appellate court to seine the record in order to discover, if possible, error by the trial court; it is the duty of an appellant to distinctly point out the alleged errors and where they can be found in the record. *Schoenhals v. Pahler,* 272 S.W.2d 228, 230[6] (Mo.1954).

The argument in Emerson's reply brief makes reference to one place in the transcript where, according to Emerson, it made a "specific objection" to the trial court's exclusion of the "alternative methods" evidence. We have examined that passage; it refers to getting on the roof "by means of a scaffold." The only evidence mentioned is "Eugene Newman's deposition." At trial Emerson presented excerpts from that deposition as part of its case. That presentation consumed 33 pages of the transcript. The deposition, however, has not been filed with us. Additionally, Emerson has failed to identify any portion of the deposition that the trial court allegedly excluded. Consequently, whatever evidence Emerson may have wanted to present from the deposition regarding "alternative methods" is consigned to speculation. Emerson's eighth point presents nothing for review.

■ Emerson's ninth (and last) point avers the trial court erred in permitting plaintiffs to elicit testimony from Gene's stepson concerning the guidance he received from Gene, in that under Missouri law the stepson was not and could not be a party to the suit and could not claim damages for Gene's death. Emerson maintains the stepson's testimony was irrelevant and prejudicial.

Plaintiffs concede the stepson had no claim for Gene's death, but remind us that in a wrongful death action, evidence of the age, health, earning capacity and habits of

---

**9.** At Emerson's request the trial court gave instruction 8 which tracked MAI 32.23 [1978 Revision]. Instruction 8 told the jury its verdict must be for Emerson if the jury believed (1) Gene knew of the danger as submitted in instruction 7—quoted in our discussion of component "B" of Emerson's second point—and appreciated such danger, (2) Gene voluntarily and unreasonably exposed himself to such danger, and (3) such conduct directly caused or directly contributed to cause any damage plaintiffs sustained.

the decedent is admissible to prove the nature and extent of the damages resulting from his death. *Grothe v. St. Louis–San Francisco Railway Co.*, 460 S.W.2d 711, 718 (Mo.1970); *Morton v. Southwestern Telegraph & Telephone Co.*, 280 Mo. 360, 217 S.W. 831, 835–36[9, 10] (1920). Emerson cites no case holding that testimony regarding those subjects can be presented by only those persons entitled to sue for the decedent's death.

Plaintiffs' lawyer, in opening statement, informed the jurors that Gene's stepchildren had "no standing to sue." In closing argument plaintiffs' lawyer specifically identified the five persons seeking damages: Gene's widow, his three children, and his mother. Those five—alone—were named in paragraph "First" of instruction 7, quoted earlier in our discussion of component "B" of Emerson's second point. It was thus made clear to the jury that the stepson had no claim for Gene's death.

Emerson's ninth point is denied.

Judgment affirmed.

SHRUM, J., and SOLBERT M. WASSERSTROM, Special Judge, concur.

HOGAN, C.J., concurs, and concurs in concurring opinion of PARRISH, J.

PARRISH, J., concurs and files concurring opinion.

MAUS, J., dissents and files dissenting opinion.

FLANIGAN, J., dissents, files dissenting opinion, and concurs in dissenting opinion of MAUS, J.

PREWITT, J., recused.

## APPENDIX

---

PARRISH, Judge, concurring.

I concur in the majority opinion. In so doing, however, I offer the following observations regarding (1) the issue relating to "prior occurrences" of electrical accidents involving aluminum ladders as were summarized by plaintiffs' Exhibit 54–A; (2) the sufficiency of the plaintiffs' modification of MAI 25.04 as to any effect it had on the contributory fault instruction given on be-

half of defendant; and (3) the testimony adduced, over defendant's objection, regarding the actions which the decedent, Gene Eagleburger, customarily took, due to his illiteracy, when he had written materials relating to his job.

### Issue of Prior Occurrences

There was no issue in this case as to the cause of Gene Eagleburger's death. The simplicity of the facts in this case, in my opinion, makes unnecessary the showing of greater similarities between the occurrence which produced the death of Gene Eagleburger and the prior occurrences in evidence which were summarized by plaintiffs' Exhibit 54–A.

The force that caused Gene Eagleburger's death was electrical current which flowed from a power line to the aluminum ladder, or hoist, which had been sold by defendant Emerson Electric Co. and which was being raised by Gene Eagleburger with the assistance of Jack Eagleburger (who was also killed in the accident which produced this litigation) and John Eagleburger. Defendant acknowledges that the electricity that flowed through the ladder, or hoist, caused Gene's death. The dispute between the parties is over the question of whether the ladder, or hoist, was an unreasonably dangerous product, not over whether Gene Eagleburger died as a result of electrocution.

Plaintiffs' expert witness contended that the ladder, or hoist, was unreasonably dangerous as manufactured and sold because (1) it was unwieldy for the reason that it was constructed so as to permit it to be raised to a height of 44 feet as a single unit; (2) it exceeded the length that the National Electric Safety Code recommended for such devices utilized in the vicinity of high voltage electrical conductors; (3) the device had no insulating materials or links to guard against foreseeable conduction of electrical currents; and (4) the device contained no appropriate warnings of the inherent dangers produced by its use near high voltage electrical conductors. The evidence must be viewed in the light most favorable to those theories of submission, and plaintiffs are accorded all reasonable inferences springing from the evidence so viewed which aid their theories of submission. *Wallander v. Hicks,* 526 S.W.2d 848, 850 (Mo.App.1975).

Evidence was presented that permitted the jury to find that substantially more physical strength was necessary to extend the ladder, or hoist, beyond the 30 feet which plaintiffs' expert suggested as a limitation on length than was necessary to extend the device up to 30 feet. Two men, according to the evidence adduced, could extend the device, with significant control over it, for 30 feet, but not for the 40–plus feet to which the device in question could be raised. Beyond a 30 foot extension, the device became unwieldy and difficult for two men to handle.

The potential unwieldiness of the ladder, or hoist, in my opinion, was an appropriate basis upon which a jury could find that the device was unreasonably dangerous, as manufactured and sold, to use around electrical lines. For that reason, it is my belief that the fact that aluminum will conduct electricity was a proper issue in this case and that the admission of plaintiffs' Exhibit 54–A was proper to demonstrate the dangerousness of a ladder, or hoist, which would extend to the length of the one in question. On that basis, I believe that the admission of plaintiffs' Exhibit 54–A into evidence was not an abuse of the trial court's discretion.

### Modification of MAI 25.04

I do not believe that plaintiffs' modification of MAI 25.04 had the effect of virtually eliminating the defense of contributory fault in this case.

Instruction 7, plaintiffs' verdict-director, after hypothesizing that plaintiffs should recover if the alleged defective condition of the ladder, or hoist, (the product) "directly caused or directly contributed to cause the death of Gene Eagleburger," went on to say "unless you believe plaintiffs are not entitled to recover by reason of Instruction

No. 8." Instruction 8 hypothesized certain conduct of Gene Eagleburger and told the jury its verdict must be for Emerson if the jury believed "such conduct directly caused or directly contributed to cause any damage plaintiffs may have sustained."

Reading the two instructions together, in my opinion, all the jury would have had to find in order to return a verdict for defendant was that Gene Eagleburger's conduct directly caused or directly contributed to cause any damage that plaintiffs sustained.

### Effect of Decedent's Illiteracy Regarding Written Directions or Warnings

The evidence adduced infers that Gene Eagleburger had a habit, due to his illiteracy, of taking written instructions relating to his job to his wife for her to read to him. This apparently was a general habit. The evidence presented did not go to any direct issue related to Gene's culpability in this case, but was used to attempt to rebut defendant's assertion that, had there been written operating instructions for the ladder, or hoist, those instructions would have been of no use to Gene. Evidence of "habit" can be admissible. *Hawkins v. Whittenberg,* 587 S.W.2d 358, 363 (Mo.App. 1979), citing other cases. The authorities cited in *Hawkins* afford a trial judge considerable discretion regarding the admissibility of such evidence. It is also not unusual for courts to determine that, if erroneously admitted, such evidence is not prejudicial. *Id.; Hodges v. Hill,* 175 Mo.App. 441, 161 S.W. 633 (1913). In this case, the admission of this evidence was, in my opinion, within the sound discretion of the trial judge. I further believe, considering the entire record, that even if, in this instance, the trial judge abused his discretion, it did not prejudice the jury.

I concur in the majority opinion.

MAUS, Judge, dissenting.

I must respectfully dissent because I believe the plaintiffs' modification of MAI 25.04 [1978 Revision] Verdict Directing—Strict Liability—Product Defect was fundamentally erroneous and prejudicial. As noted in the majority opinion, the paragraph of MAI 25.04 submitting causation reads as follows.

> "Fourth, plaintiff was damaged as a *direct result* of such defective condition as existed when the (describe product) was sold." (Emphasis added.)

Plaintiffs' verdict directing instruction (Instruction No. 7) modified that paragraph to read as follows.

> "Fifth, such defective condition as existed when the product was sold by said defendant directly caused or directly *contributed to cause* the death of Gene Eagleburger,". (Emphasis added.)

The effect of this modification must be evaluated considering the defendant's submission of Gene Eagleburger's contributory fault by an instruction patterned upon MAI 32.23 [1978 Revision] Affirmative Defenses—Product Liability—Strict Liability—Contributory Fault. Instruction No. 8 read as follows.

> "Your verdict must be for defendant Emerson Electric Co. if you believe:
>
> First, when the product was used, Gene Eagleburger knew of the danger as submitted in Instruction No. 7 and appreciated the danger of its use, and
>
> Second, Gene Eagleburger voluntarily and unreasonably exposed himself to such danger, and
>
> Third, such conduct directly caused or directly contributed to cause any damage plaintiffs may have sustained."

"Under the substantive law of Missouri and Section 402 A, *supra,* while contributory negligence does not bar recovery, contributory fault is an affirmative defense to strict liability." *McGowne v. Challenge–Cook Bros., Inc.,* 672 F.2d 652, 662 (8th Cir.1982) (emphasis in original.)

"The Restatement position is that if the user 'discovers the defect and is aware of the danger, and nevertheless proceeds

unreasonably to make use of the product and is injured by it, he is barred from recovery.' 2 Restatement, supra, § 402A, p. 356. In 3 Restatement, Law of Torts, First, § 524, this defense is referred to as 'contributory fault.'" *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362, 365 (Mo. 1969).

*Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo. banc 1986), held that comparative fault based upon negligence did not apply to actions based upon the doctrine of strict liability which was adopted in *Keener*. But, *Lippard* does not hold that the doctrine of contributory fault, as distinguished from comparative fault, set forth in the Restatement and adopted in *Keener* is not applicable to such actions. In fact, *Lippard* holds:

"Contrary to what is said in Judge Donnelly's dissent, this opinion does not eliminate the giving of MAI 32.23 in an appropriate case." *Lippard*, at 493.

The viability of the defense of contributory fault was also acknowledged in *Barnes v. Tools & Machinery Builders, Inc.*, 715 S.W.2d 518 (Mo. banc 1986). The continued existence of that defense was also recognized in the Tort Reform Act of 1987.

"Contributory fault, as a complete bar to plaintiff's recovery in a products liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section." § 537.765.1.

That act was effective July 1, 1987.

The plaintiffs' modification is not supported or approved by *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986). In that case, the defendant manufacturer sought to escape strict liability by asserting the mechanics were negligent in improperly installing unreasonably dangerous interchangeable parts. It was in denying that contention the court appropriately made the statement concerning proximate cause. *Nesselrode* did not involve the defense of contributory fault which has remained a part of the law of product liability until the Tort Reform Act of 1987. The defense of contributory fault was available to the defendant in this action.

MAI 25.04 and MAI 32.23 were drafted to properly submit that defense in a product liability action. The concept of contributory fault is based upon the fact that a product known to the actor to be unreasonably dangerous has contributed to an injury. In every action based upon an unreasonably dangerous product, that product will be involved in or contribute to an injury resulting from its use. Yet, if a plaintiff voluntarily and unreasonably exposes himself to such danger and that exposure causes or directly contributes to cause injury, contributory fault bars recovery. In such circumstances, the plaintiff will not be injured "as a *direct result* of such defective condition". (Emphasis added.)

The plaintiffs' modification of MAI 25.04 virtually eliminates the defense of contributory fault. The prejudicial effect of the modification is established by the fact Gene Eagleburger was an experienced roofer and was specifically warned of the power line. He replied "not to worry, he wouldn't be no where near those wires." He also declined the offer of the Priest to cause the power to be turned off. Under Instruction No. 7 and Instruction No. 8, a jury could find Gene Eagleburger "knew of the danger as submitted in Instruction No. 7 and appreciated the danger of its use, and ... voluntarily and unreasonably exposed himself to such danger, and ... such conduct directly caused or directly contributed to cause" his death, yet also find the unreasonably dangerous ladder *contributed* to that death and return a verdict for the plaintiffs. The plaintiffs' modification denied the defendant the proper consideration of the defense of contributory fault.

I also believe the court erroneously admitted Plaintiffs' Exhibit 54–A. This exhibit was a summary that read as follows.

"C.P.S.C. STATISTICS SUMMARIZED

INADVERTENT CONTACT BETWEEN AN ALUMINUM LADDER AND A POWER LINE, 1977–87:

| | Deaths | Injuries | Total Victims |
|---|---|---|---|
| 'Death Certificate' File | 238 | 0 | 238 |
| 'Accident Investigation' File | 24 | 10 | 34 |
| 'Reported Incidents' File | 86 | 68 | 154 |
| | | | 426" |

As noted in the majority opinion, Exhibit 54–A was prepared by expert Greene. He reviewed a print-out of electrical accident reports from the Consumer Products Safety Commission (C.P.S.C.) which was derived from the sources indicated on Exhibit 54–A. From that print-out, Greene extracted reports of incidents he found to involve an aluminum ladder contacting an electric line outside. Greene testified that Exhibit 54–A was a summary of those incidents.

The legal background for consideration of Exhibit 54–A is set forth in the excellent article cited in the majority opinion. McCarter and Corrigan, *Evidence of Similar Occurrences and Non–Occurrences*, 46 Jour. of The Missouri Bar 126 (Mar. 1990). A relevant federal case cited in that article is *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322 (8th Cir.1985). In that case, the plaintiffs sought recovery upon the basis of a defective RH5° truck wheel rim. "The district court over objection permitted appellees to present evidence of accidents involving explosive separation of RH5° rims, with no restriction as to the circumstances or the dates of the accidents." *Hale,* at 1332. This was held to be error and the following basic standard was enunciated.

"Evidence of prior accidents is admissible only if the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar." *Id.* That test is recognized in this state. *McJunkins v. Windham Power Lifts, Inc.*, 767 S.W.2d 95 (Mo.App.1989). Other cases establish a more refined test dependent upon the purpose for which the evidence is used.

"In appraising the relevancy of similar incidents in product liability cases, courts have required the other incidents to be 'substantially similar' to the case at bar. See, e.g., *Edwards v. Consolidated Rail Corp.*, 567 F.Supp. 1087, 1105–07 (D.D.C. 1983). How substantial the similarity must be is in part a function of the proponent's theory of proof. 'If dangerousness is the issue, a high degree of similarity will be essential. On the other hand, if the accident is offered to prove notice, a lack of exact similarity of conditions will not cause exclusion provided the accident was of a kind which should have served to warn the defendant.' 1 Weinstein & Berger, Weinstein's Evidence § 401[10], at 401–66–67." *Exum v. General Elec. Co.*, 819 F.2d 1158, 1162–1163 (D.C.Cir.1987).

A similar limitation has been applied in negligence actions. *Pierce v. Platte–Clay Elec. Co–Op., Inc.*, 769 S.W.2d 769 (Mo. banc 1989). In that case, the plaintiff predicated recovery upon the basis of the negligence of the defendant in maintaining unmarked guy wires in an agricultural field. The plaintiff offered nine "trouble tickets" concerning contact between farm machinery and guy wires that occurred within the four years prior to the accident in question. The trial court admitted two of those tickets. The supreme court approved of the admission of those two tickets.

"When evidence of other accidents is introduced *to show notice of danger*, the similarity in the circumstances of the accidents need not be completely symmetrical. McCormick on Evidence, § 200 p.

590 (3rd ed. 1984). See also Martin, Basic Problems of Evidence, § 10.04(3) p. 234 (6th ed. 1988). In this case, both trouble tickets introduced described incidents similar to the Pierce accident where farm machinery contacted appellant's guy wires resulting in support poles breaking." *Pierce*, at 774. (Emphasis added.)

The court emphasized the limitation by the following observation.

"The attorneys' questions were strictly limited to the target issue of notice." *Id.*

The only circumstance of the incidents reflected in the statistics of Exhibit 54–A that could be considered as similar to the circumstances of this case is the fact that an aluminum ladder contacted wires charged with electricity. In this case, an aluminum track for hoisting equipment contacted a power line. Witness Greene acknowledged this to be true. Greene bolstered these meager facts and his reliance upon those statistics by citing a section of the National Electric Safety Code. That section prescribes that uninsulated wires carrying electricity shall be at least 15 feet from the ground. He assumed the contacts referred to in Exhibit 54–A were between an uninsulated line 15 feet above the ground and an aluminum ladder. He ignored other possibilities such as the fact uninsulated lines might be maintained at a height of less than 15 feet, or that an aluminum ladder might be used by a householder to restore a temporarily downed power line. He ignored his own admission that in referring to the reports included in Exhibit 54–A, "There was a few of those that involved the drop lines."

The only circumstance of the incidents reflected in Exhibit 54–A common to the incident in question is the fact that an aluminum ladder and the aluminum track conduct electricity. That is generally acknowledged to be true. That is the import of the testimony of Monohan in which he acknowledged the statistics gathered by the Consumer Products Safety Commission to be relevant "[i]n so far as electrocution of aluminum ladder and powerlines, yes". The fact that aluminum will conduct electricity cannot be regarded as an issue in this case.

The product in question was a hoist using an aluminum track to raise heavy loads for projects such as roofing. It was obviously a device designed and intended to be used by professionals in hoisting materials to appreciable heights. It is equally obvious that such a device often, if not always, must be longer than 15 feet.

The issue in this case is not whether or not an aluminum track will conduct electricity. It is acknowledged the hoist track manufactured by the defendant would do so. Nor is the issue whether or not that hoist on any given occasion was involved in an injury or death by electricity. The issue is whether or not the hoist posed an *"unreasonable* danger". An important consideration in determining whether or not a product is unreasonably dangerous is the frequency and severity of injuries involving the use of that product. To be relevant in this case statistics should be based upon the use of a commercial hoist by professional workmen.

The plaintiffs' use of the number of victims shown in Exhibit 54–A is comparable to the attempted use of 570 incidents of a given model of gun accidentally firing. *Shields v. Strum, Ruger & Co.*, 864 F.2d 379 (5th Cir.1989). In approving the rejection of 500 of such incidents, even to prove notice of an alleged defect, the court observed: "The Shields apparently believe that the district court should have allowed them to argue to the jury that in those reports that did not state why the gun accidentally fired, the jury should assume that the accident was caused by the defect alleged by the plaintiffs. That argument clearly would have been improper." *Shields*, at 381.

The prejudice arising from the plaintiffs' use of Exhibit 54–A is clearly demonstrated in *Hale v. Firestone Tire & Rubber Co.*, supra. In *Hale*, the plaintiffs contended it was proper to present evidence of 210 prior accidents because they involved a given model of a wheel rim. In rejecting that contention, the court succinctly held the following.

"The district court erred in admitting evidence of all RH5° explosive separation accidents and in shifting to Firestone and Budd the burden of showing dissimilarity after the evidence was admitted. [Plaintiffs] admit that the circumstances of the accidents differ; the only similar circumstance indicated in the record is the explosive separation of the wheel rim. This is an insufficient showing of similarity." *Hale,* at 1332.

In this case, the only similarity is the contact of an aluminum ladder with a power line. This is an insufficient showing of similarity.

The plaintiffs made persuasive use of the number of victims shown by Exhibit 54–A not to establish notice, but that the product was unreasonably dangerous. Counsel used the number of victims in voir dire, opening statement and cross-examination. Expert Greene, with painstaking care, explained to the jury how one should analyze whether a product is unreasonably dangerous. He prepared a chart to visualize to the jury the steps or factors involved in that evaluation. He said you should first look at the severity of the hazard. Then he testified, "And then you also consider the frequency of the occurrence". Greene used the statistics to establish and bolster his opinion the hoist was unreasonably dangerous. He emphasized the importance of those statistics when he was permitted, over Emerson's objection, to speculate that no more than half of the instances of such inadvertent contact were reported to the C.P.S.C.

The prejudice to Emerson from the admission of those statistics was enhanced by the admission, over objection, of Plaintiffs' Exhibit 82. Exhibit 82 was the American National Standards Institute, Inc. (ANSI) safety requirements for portable metal ladders. Greene testified that one of those standards prescribed that a single metal ladder should not exceed 30 feet in length. Those standards expressly declare they are not applicable to hoisting equipment. Nonetheless, Greene concluded that the hoist track violated that standard. This standard was emphasized when Greene said that if the hoist track had been 30 feet

long the accident wouldn't have happened. The combination of the C.P.S.C. statistics and the ANSI standards for ladders provided a virtually unanswerable argument the aluminum hoist track 40 feet in length was unreasonably dangerous.

"It has uniformly been held that incompetent evidence on a material issue is presumed to be prejudicial, *Holmes v. Terminal R.R. Ass'n of St. Louis,* 363 Mo. 1178, 257 S.W.2d 922, 927; *Schears v. Missouri Pacific Railroad Company,* Mo., 355 S.W.2d 314, 318, unless clearly shown to be otherwise, *Zarisky v. Kansas City Public Service Co.,* 239 Mo.App. 396, 186 S.W.2d 854, and the burden of so showing is on the respondent. *Schears v. Missouri Pacific Railroad Company,* supra." *Hamilton v. Missouri Petroleum Products Co.,* 438 S.W.2d 197, 201 (Mo.1969).

Exhibit 54–A was incompetent evidence on a material issue. The record affirmatively demonstrates it was prejudicial to Emerson and its admission constitutes reversible error. Cf. *Hale v. Firestone Tire & Rubber Co.,* supra. As I would reverse and remand the case upon each of the above two points, I have not accepted or rejected Emerson's other points.

FLANIGAN, Judge, dissenting.

I respectfully dissent and I concur in the dissenting opinion of Judge Maus.

In rejecting Emerson's point 2B, which attacks paragraph "Fifth" of Instruction 7, the principal opinion says: "Paragraph 'Fifth' of Instruction 7 does not parrot the final paragraph of MAI 25.04." The principal opinion also says: "Emerson's claim against the City remains pending, hence Emerson can scarcely deny this case involves two or more causes of damage." The principal opinion, as I construe it, holds that paragraph "Fifth" of Instruction 7 is authorized by MAI 19.01.

In *Fahy v. Dresser Industries, Inc.,* 740 S.W.2d 635, 637–638 (Mo. banc 1987), our Supreme Court said:

"In order for a plaintiff to recover under a products liability theory for an injury caused by an allegedly defective

product, he must establish each of the following:

(1) defendant sold the product in the course of its business;

(2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use;

(3) the product was used in a manner reasonably anticipated;

(4) plaintiff was damaged *as a direct result of such defective condition as existed when the product was sold.*

MAI 3d 25.04. See also *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375–76 (Mo. banc 1986); *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 366 (Mo.1969)." (Emphasis added.)

Element (4) requires proof that plaintiff was damaged *as a direct result* of the defective product. Element (4) is required by MAI 25.04.

When MAI "contains an instruction applicable in a particular case which the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other on the same subject." Rule 70.02(b). "The giving of an instruction in violation of the provisions of this Rule shall constitute error, its prejudicial effect to be judicially determined." Rule 70.02(c).

The fact that paragraph "Fifth" of Instruction 7 departs from the language of *Fahy* and MAI 25.04 should not be swept under the rug by the comment that complying with those authorities is mere parroting.

In its 1963 Report to the Supreme Court, the MAI committee said:

"There are hundreds of currently acceptable instructions which use language more favorable to one side or the other than the proposed instructions. If counsel are permitted to 'improve' the approved instructions, even within the confines of specific precedents, the value of these instructions will be lost. Each such 'improvement' by one counsel will prompt an offsetting 'improvement' by his opponent and after a while the court will not be able to find the original with a divining rod."

MAI 3rd ed., p. XL.

The fact that Emerson has a third party petition pending against the city has nothing to do with the inquiry. So far as this jury was concerned, the city was not a party, no instruction mentioning the city was given, and there was no issue concerning the presence or lack of negligence on the part of the city.

I do not agree that MAI 19.01 is authority for paragraph "Fifth" of Instruction 7. MAI 19.01 reads:

"19.01. [1986 Revision] Verdict Directing Modification—Multiple Causes of Damage

In a case involving two or more causes of damage, the 'direct result' language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute one of the following:

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Third, such negligence either directly caused damage to plaintiff or combined with the [acts of (here *describe another* causing damage)] [condition of the (here describe product)] to directly cause damage to plaintiff." (Emphasis added.)

The first paragraph "Third" in MAI 19.01 contains the word "negligence." The second paragraph "Third" in MAI 19.01 also uses the word "negligence." Paragraph "Fifth" of Instruction 7 does not. Moreover, if the negligence of the *city* was the purported reason for the wording of paragraph "Fifth" of Instruction 7, the second paragraph "Third" of MAI 19.01 requires a *description* of the city which, at the very least, would require the naming of the city. Instruction 7 does not do so.

The liability issue before the jury involved the conduct of plaintiffs' decedent and the condition of Emerson's product. The words—"or directly contributed to cause"—contained in paragraph "Fifth" of Instruction 7 are subject to the construc-

tion that they refer to the conduct of decedent. Indeed that is the only reasonable construction, and the drafter of Instruction 7 so intended.

So construed, paragraph "Fifth" of Instruction 7 reads:

> "Fifth, such defective condition as existed when the product was sold by said defendant directly caused or, combined with the conduct of Gene Eagleburger, directly contributed to cause the death of Gene Eagleburger"

That construction served to weaken or neutralize Instruction 8 which was given on behalf of Emerson and which followed MAI 32.23.

Instruction 8 reads:

> "Instruction No. 8

> Your verdict must be for defendant Emerson Electric Co. if you believe:

> First, when the product was used, Gene Eagleburger knew of the danger as submitted in Instruction No. 7 and appreciated the danger of its use, and

> Second, Gene Eagleburger voluntarily and unreasonably exposed himself to such danger, and

> Third, such conduct directly caused or directly contributed to cause any damage plaintiffs may have sustained."

Paragraph "Fifth" of Instruction 7 was a calculated device to reduce the burden imposed upon plaintiffs by paragraph "Fifth" of MAI 25.04 and to dilute Instruction 8. It is no answer to say that Instruction 7 refers to Instruction 8. Such reference is an additional requirement of MAI 25.04. This court should not condone a clear and deliberate violation of MAI 25.04. Instruction 7 deprived Emerson of a fair trial. The trial court committed prejudicial error in giving Instruction 7.

I also agree with Judge Maus that Exhibit 54–A was improperly admitted. The foundation for Exhibit 54–A was plaintiff's Exhibit 54. All Exhibit 54 contained were incidents, happening outdoors, involving persons injured by reason of a contact between an aluminum ladder and a power line. Exhibit 54 did not contain the circumstances under which the injuries were sustained. It is common knowledge that aluminum is a conductor of electricity, a fact also known to the decedent. Exhibit 54 was proof only of that obvious fact. Since it contained no evidence that the accidents occurred under circumstances substantially similar to those at issue in the case at bar, it was inadmissible.

I would reverse and remand.